ERVIN F. PALMER, d.b.a. PALMER LANDSCAPING AND GRADING, v. WATSON CONSTRUCTION COMPANY AND ANOTHER.

121 N. W. (2d) 62.

April 5, 1963—No. 38,713.

---

196

*Carlsen, Greiner & Law,* for appellants.
*Nolan, Alderman & Holden,* for respondent.

SHERAN, JUSTICE.

The appeal is from an order of the district court denying defendants' motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

The action was instituted by plaintiff to recover progress payments, retained percentages, and damages for breach of contracts for excavation and backfilling, one being dated August 26, and the other September 20, 1960. In response defendant Watson Construction Company[1] asserted default by plaintiff and counterclaimed for damages occasioned by his failure to perform.

The subject matter of the contracts was excavation, backfilling, sodding, and seeding to be performed in connection with the construction of four buildings and connecting tunnels being built at the state hospital at Brainerd pursuant to a prime contract between defendant and the State of Minnesota.

Relevant contract provisions fixing the obligations of these parties included the following:

"The Contractor agrees—

\* \* \* \* \*

"h) To pay the Subcontractor on demand for his work or materials as far as executed and fixed in place, less the retained percentage, \* \* \*."

---

[1]Further reference to defendant-appellant Reliance Insurance Company is not necessary to an understanding of the problem involved. The disposition of the case made herein, however, applies to both defendants.

The subcontractor's obligations are described as follows:

"Section 3. The Subcontractor agrees to complete the several portions and the whole of the work herein sublet by the time or times following: As required by the progress of the job. Sub-Contractor agrees to provide sufficient equipment to complete the excavation of the four buildings this fall and, further agrees that if he does not provide proper equipment to complete his contract, the contractor has the right to bring in additional equipment and charge the cost of same against his contract."

The contracts involved do not contain provisions governing resolution of disputes between the parties as to quantities of work performed for purpose of progress payments where, as here, there was no certification by the architect.[2]

On October 6, 1960, plaintiff submitted to defendant a statement for work completed as of September 20, 1960, which included a claim for $7,760 for excavation of 19,400 cubic yards of earth at 40¢ per cubic yard. Upon receipt defendant disputed the quantity of excavation for which it had been billed and sent plaintiff a check which included the sum of $5,400, less retained percentage, representing payment for excavation of 13,500 cubic yards of material. Protracted negotiations then ensued during the course of which plaintiff insisted that he was entitled to payment based upon his figures, which represented the quantity of material which he claimed he had in fact removed. Defendant persisted in its refusal to accept these figures on the theory that if the quantity of material claimed by plaintiff had in fact been removed, plaintiff had "overexcavated," i. e., excavated from the foundation grade to the level of the ground at an angle in excess of that prescribed by defendant and by proper and customary standards of workmanship. Plaintiff's response to this contention was that certain stakes had been placed at the job site by defendant and that plaintiff, excavating

---

[2]Neither party to the contracts insisted upon architect's certificates as to excavation done and hence the provisions of the contracts pertaining to payment upon the architect's certificate were waived and neither could insist on strict compliance or payment thereunder. Standard Const. Co. Inc. v. National Tea Co. 240 Minn. 422, 62 N. W. (2d) 201.

with reference to the stakes, was performing the work in the manner in which defendant had directed.

Defendant denied that the stakes had been placed by its agents and in this connection Walter Coppersmith, job superintendent for defendant, testified:

"Q. Who did the staking out of whatever staking was done for the excavation?

"A. Mr. Palmer and his men.

"Q. Did you ever send anybody from the Watson Company out to do staking of the excavation?

"A. None whatsoever."

Following further testimony with respect to the stakes, Coppersmith related this conversation with the plaintiff:

"Q. What conversation did you have at that time?

"A. I told them they were not digging according to my instructions and were overdigging.

"Q. What did Mr. Palmer have to say about it?

"A. He told me it—with that type of equipment they needed roads to get in and out and with that type of equipment they couldn't dig 1 to 1 slope and that's the best they could do with that type of equipment.

"Q. Did you have conversation with him at that time about payments?

"A. Yes, I told him I didn't want the hole dug that large and that it made it too tough to build the buildings and I told him we would not be paying him for that type of digging. He told me not to worry about it and he said, 'When the holes are measured we will allow for our roads and the over-excavation and will settle up that way, and don't worry about it.' "

Although plaintiff submitted statements for and received payment on account of additional excavation performed during the month of November, the disagreement with respect to the quantity for which he was entitled to payment in connection with the digging done by him and included in the October 6 billing was never resolved. Apparently construction work on the project was resumed in February 1961, but plaintiff de-

clined to perform further under his subcontracts unless he was paid in conformity with his calculations. Upon recross-examination he was asked:

"Q. Do you remember receiving a letter from Watson in February stating if you did not get back on the job they were going to have to get somebody else to do it?
"A. Yes.

\* \* \* \* \*

"Q. You didn't ever go back on the job to do the work, did you?
"A. Not after that time."

Correspondence between defendant and plaintiff and plaintiff's attorney during February, March, and April reveals that the parties had reached an impasse. By letter dated March 2, 1961, which reviews the February correspondence and reflects the persistence of the disagreement, defendant wrote, "Further, we are requesting at this time a definite statement from Mr. Palmer as to whether he intends to complete his contract." By letter dated March 6, 1961, defendant advised plaintiff that it was correcting the grade level in one of the basements and completing the backfilling on this building and would backcharge the expense to plaintiff. On March 16, 1961, defendant wrote to plaintiff, "If we do not hear from you by return mail that you intend to complete your contract on this project, it will be necessary for us to hire another contractor to complete your contract on a time and material basis. Any costs over and above your total contract price will necessarily have to be assumed by your firm." On March 20, 1961, plaintiff's attorney wrote to defendant as follows: "Mr. Palmer has always been willing to complete his contract but he is not going to complete the contract unless you fulfill your obligation to make payment as set forth above." In addition this letter contains a statement that plaintiff was unable to pay another subcontractor and that defendant was placing plaintiff "in a position where he cannot proceed with the contract by reason of this inability to pay."

The jury was instructed that if refusal by plaintiff to continue performance under the contract was justified, he was entitled to recover not

only for the excavation and other contract services actually performed, but also for such profits as he would have realized had performance been completed and payment made according to the agreement. The jury was informed that if plaintiff's refusal to proceed was not justified, defendant was entitled to recover damages on its counterclaim. No instructions were given or requested that plaintiff would be entitled to recover in quantum meruit for the services in fact performed by him up to the point when the disagreement brought work to a halt.

■ From this review it can be seen that the question whether plaintiff was entitled to compensation for the excavation actually done, even though the quantities removed were greater than necessary, became of crucial importance. In that connection the court instructed the jury:

"You should first determine the amount of excavation and backfilling actually performed by plaintiff directly or through his subcontractor, and next you should consider and determine whether or not all of such excavation and resulting backfilling was performed by plaintiff and his subcontractor under the direction of Watson. If Watson or its superintendent Coppersmith placed stakes about the excavation sites, or caused them to be so put around such sites, and the subcontractor of plaintiff in reliance upon the same made the indicated excavation, Watson would be liable to plaintiff under the contract for such excavation, irrespective of whether such excavation was needed or not.

"The stakes in question, if any, were upon the site of Watson's Construction project, and *if Watson allowed such stakes to stand without protest and plaintiff and his subcontractor to excavate in reliance upon such stakes, Watson will be deemed to have ordered such excavation* and liable to compensate plaintiff under the contract unit price for such excavation within such excavation stakes." (Italics supplied.)

We construe this instruction to mean that the jury was to find in plaintiff's favor if it concluded that defendant's agents permitted the stakes to remain in place at the job site without regard to who set them, presumably on the theory that inaction by defendant, under the circumstances, ratified the placement of the stakes to delineate the outer boundaries of the excavation slope. This instruction prevented the jury from evaluating the testimony of Coppersmith which has been set out

above and which, if believed, would make acquiescence by defendant meaningless.

At the close of the instruction and before the jury retired, defendant's attorney noted that he had two exceptions to the charge as given. After discussion at the bench, which was not reported, an instruction was given apparently in response to one of these exceptions. The jury then retired and the record shows that defendant's attorney excepted to that portion of the court's charge wherein it was stated that "Watson would be liable if Watson permitted the stakes to stand without protest, without making further explanation to the effect that there might be other explanations for the standing of the stakes satisfactory to the jury."

The record then shows the following exchange between the trial judge and defendant's attorney:

"The Court: I think I am going to make a statement for the record that the Court went over its complete charge with both counsel before the case was argued, and at that time the Court discussed all angles of the case with both counsel and that counsel for defendant made no request at that time for the instructions he has asked now or regarding the exceptions he has taken now. Furthermore, that at the request of both parties, including the attorney for plaintiff, the case was sent to the jury at 6:12 p. m. and that to revise the charge at this time under these circumstances would be unfair to the jury and everybody concerned, except possibly the defendant.

"Mr. Carlsen: May the record show the defendants concur with the fact statement of the judge as to what took place?"

In its motion for a new trial defendant asserted: "That the court erred in instructing the jury that defendant consented to the size of the excavation if it permitted the stakes to remain in place without objection."

Defendant's assignments of error in this court that the trial court "erred in denying defendant's motion for a new trial" and "erred in denying defendant's motion for judgment notwithstanding the verdict" are ineffective to bring the quoted instruction before us for review. Winans v. Northern States Power Co. 158 Minn. 62, 196 N. W. 811.

Plaintiff has stated in his brief, "[W]e take the position their appeal is confined to the assignments of error set forth in their notice of motion for judgment notwithstanding the verdict or in the alternative for a new trial, as well as in their appellants' brief."

However, the propriety of this instruction is argued by both parties. Since the instruction goes to the heart of the case, we have exercised discretion in favor of considering it on this appeal.[3] The instruction being erroneous and basic, defendant's motion for a new trial should have been granted. Sowada v. Motzko, 256 Minn. 395, 98 N. W. (2d) 182. It is apparent that the trial judge made every effort to secure suggestions from the attorneys before the jury was charged. It is regrettable that the fault in this statement was not called to the attention of the trial court at that time. This practice of reviewing instructions prior to delivery is to be encouraged and fixes upon the trial attorney a distinct obligation to call to the court's attention any aspect of the charge considered to be erroneous and prejudicial. However, we recognize that even with full cooperation between court and counsel it is possible that errors in the charge will not be detected until heard in the formal atmosphere prevailing at the time of the jury's final instruction. We are not prepared to say that the failure of an attorney to note his objections during the preinstruction conference constitutes a waiver of an exception which he would otherwise be entitled to assert, at least in a case such as this where the statement made in the instruction, if understood by the jury in the sense we understand it, could be determinative of the outcome.

■ Apart from the instruction discussed, it is our opinion that evidence does not sustain the verdict in so far as it includes damages for loss of the profit anticipated in the event of full performance. A party to a contract who is entitled to progress payments may treat the failure to make such payments when due as a breach of the contract which will justify him in refusing to perform further and which will give legal basis for a claim for the reasonable value of the services performed or

---

[3]Distillers Distributing Co. v. Young, 261 Minn. 549, 113 N. W. (2d) 175; see, In re Delinquent Real Estate Taxes, Roseau County, 212 Minn. 562, 4 N. W. (2d) 783; Finley v. Erickson, 122 Minn. 235, 142 N. W. 198.

material supplied pursuant to the contract. Newton v. Highland Improvement Co. 62 Minn. 436, 64 N. W. 1146; Beatty v. Howe Lbr. Co. 77 Minn. 272, 79 N. W. 1013; Peet v. City of East Grand Forks, 101 Minn. 518, 112 N. W. 1003. His alternative course is to continue with performance and recover the contract price in full upon completion. Hjorth v. Albert Lea Machinery Co. 142 Minn. 387, 172 N. W. 488; Wharton & Co. v. Winch, 140 N. Y. 287, 35 N. E. 589. It is true that a party ready, willing, and able to perform may recover damages for breach of contract, as distinguished from the reasonable value of the services rendered or material supplied, if he is *prevented* from performance by an act or omission of the other contracting party. John Newton Porter Co. v. Kiewel Brg. Co. 137 Minn. 81, 162 N. W. 887. We are committed in this state, however, to the rule that nonpayment of installment obligations is not in and of itself such prevention of performance as will make possible suit for loss of profits even though the party entitled to payment may lack working capital. Beatty v. Howe Lbr. Co. *supra.*

Although the letter written by plaintiff's attorney on March 20 stated that nonpayment was interfering with the discharge of Palmer's obligation to his subcontractor and thus preventing completion, there is nothing in the testimony of the subcontractor, who was called as a witness in behalf of plaintiff, to support this argument adequately. While the parties to a construction contract could make nonpayment of progress payments such an event as would empower the party entitled to the money to discontinue performance and sue for that which he would have earned had the contract been completed, we find no such provision in the agreements here involved. It is conceivable that refusal to make progress payments without justification and under circumstances where the refusal is intended to make performance by the contractor impossible could be considered such prevention of performance as would justify recovery of profits for breach of an indivisible contract. For the present, it is sufficient to say that this is not such a case.

Reversed and remanded for a new trial.