No. 95-2112

First State Bank of Floodwood;    *
Floodwood Agency, Inc.; John F.    *
Schilling; William J. Gravelle;    *
Joseph Bullyan; Eugene J.    *
Stowell,    *
     *
     Plaintiffs - Appellants,    *
     *   Appeal from the United States
     v.    *   District Court for the
     *   District of Minnesota.
Jerry J. Jubie; Irene M. Jubie;    *
Janine I. Suonvieri; Kirk M.    *
Suonvieri; Todd Jubie; Thomas    *
Jubie, Kathie Jubie; Timothy    *
Jubie,    *
     *
     Defendants - Appellees.    *

Submitted:   December 11, 1995

Filed:   June 7, 1996

Before BOWMAN and LOKEN, Circuit Judges, and SCHWARZER,[*] District Judge.

LOKEN, Circuit Judge.

John Schilling, William Gravelle, Joseph Bullyan, and Eugene Stowell acquired the First State Bank of Floodwood, Minnesota (the "Bank"), from Jerry and Irene Jubie by purchasing their stock in a holding company, Floodwood Agency, Inc. (the "Agency"). Extensive litigation has ensued. In this case, the individual purchasers,

---

[*] The HONORABLE WILLIAM W. SCHWARZER, United States District Judge for the Northern District of California, sitting by designation.

the Bank, and the Agency (collectively, the "Purchasers") sued the Jubies, asserting contract claims and common law and statutory fraud claims arising out of allegedly undisclosed bad loans, insider loans, and other financial problems that have plagued the Bank since its purchase. The Jubies counterclaimed for breach of Jerry Jubie's Retirement Agreement with the Bank. Following a lengthy trial, the jury returned a special verdict awarding the Purchasers $106,218 on some of their claims, awarding them no damages on their claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"), rejecting their remaining claims, and awarding the Jubies $292,947 on their Retirement Agreement counterclaim. The district court[1] entered judgment on the jury verdict, denied the Purchasers' post-trial motions, and awarded them $45,000 in attorney's fees under state law. The Purchasers appeal the damage and fee awards. We modify the Retirement Agreement award and otherwise affirm.

## I. Background.

Jerry Jubie was President and Chairman of the Board of the Bank for nearly twenty years. His wife Irene served as Secretary. They owned all the Agency's stock, thereby controlling some 95% of the Bank's outstanding stock. By early 1987, the Bank was in trouble and Jerry Jubie was in poor health. The Bank's federal regulator, the Federal Deposit Insurance Corporation (FDIC), was investigating its financial soundness and management quality.

In March 1987, the Bank's board of directors rewarded Jerry Jubie's long tenure with a Retirement Agreement, promising retirement payments of $1500 per month for life commencing October 1987, plus continuing group life and health insurance benefits.

---

[1] The HONORABLE RAYMOND L. ERICKSON, United States Magistrate Judge for the District of Minnesota, who tried the case by consent of the parties. See 28 U.S.C. § 636(c).

-2-

The Agreement was intended to pave the way for a management change and sale of the Bank.  On October 9, 1987, Jerry and Irene Jubie as sellers and Schilling and Gravelle as buyers entered into a Purchase Agreement providing that, at the end of that month, buyers would purchase the Agency's stock at a price equal to 95% of the book value of the Bank's stock, subject to regulatory approvals.  The Purchase Agreement granted buyers "access to all bank records."  It provided that the Retirement Agreement "shall remain in full force and binding on the bank," subject to specific modifications, such as a provision that, after the sale, Jubie would reimburse the Bank for the cost of his group life and health insurance.

Regulatory approvals proved to be a problem.  On November 30, Jerry Jubie agreed to entry of an FDIC order prohibiting him from serving as a director or officer of any bank without FDIC approval.  The FDIC issued this order on February 4, 1988, effective ten days later.  More significantly, on February 1, 1988, the FDIC issued a fifteen-page cease and desist Order against the Bank, imposing onerous management, equity capital, loan collection, and bad loan charge-off restrictions.  At this time, the Jubies still owned the Bank, but the buyers held two positions on its board of directors.

On July 28, 1988, an Addendum to the Purchase Agreement was signed by the Jubies and by all four individual purchasers fixing the purchase price at $528,582, based upon 95% of the book value of the Bank's stock at closing.  The Jubies now guaranteed portions of four troubled loans to outsiders, and made specific guarantees regarding numerous outstanding loans to members of the Jubie family.  All of these guarantees were secured by the payments owed Jubie under the Retirement Agreement.  With this Addendum in place, the Purchase Agreement closed on August 9, 1988.

Some months after the purchase, the buyers commenced an internal investigation at the Bank and allegedly discovered many bad loans, concealed losses, and other irregular transactions.

Shortly thereafter, the Bank ceased making payments under the Retirement Agreement. The Purchasers then commenced this action, alleging, in essence, that the Jubies had criminally mismanaged the Bank and then had "cooked" the Bank's books at closing, concealing numerous insider and other bad loans. Claiming some $350,000 in damages, the Purchasers asserted causes of action for breach of contract, breach of fiduciary duty, common law fraud, state and federal statutory fraud, and violations of RICO. The Jubies counterclaimed for breach of the Retirement Agreement.

The case was submitted to the jury with an extensive special verdict form. The jury found that the Jubies breached fiduciary duties to the Bank, breached the Purchase Agreement, and violated two Minnesota statutes, Minn. Stat. § 80A.01 (fraud in connection with the sale of securities) and Minn. Stat. § 325F.69 (consumer fraud). It awarded damages of $106,218 on these claims. The jury also found RICO violations but awarded no damages on the RICO claims. It found that the Jubies had not violated S.E.C. Rule 10b-5 nor committed common law fraud. Finally, the jury awarded the Jubies $292,947 in present and future damages on their Retirement Agreement counterclaim. The district court then awarded the Purchasers $45,000 in attorney's fees under the Minnesota fraud statutes, denied all other post-trial motions, and entered judgment on the jury's verdict. Only the Purchasers appeal.

## II. The Purchasers' Claims.

The Purchasers first argue that they are entitled to judgment as a matter of law or a new trial on the issue of RICO damages. They rely upon Rosario v. Livaditis, 963 F.2d 1013, 1020-21 (7th Cir. 1992), cert. denied, 506 U.S. 1051 (1993). In that case, a jury awarded $600,000 damages for violations of the Illinois Consumer Fraud Act but zero damages for RICO violations that were "supported by identical facts," 963 F.2d at 1021. Because of the complete factual overlap, the Seventh Circuit reversed the verdict

-4-

as contrary to law and remanded for a new trial on RICO damages.  <u>Accord</u> <u>Video Int'l Prod., Inc. v. Warner-Amex Cable Commun., Inc.</u>, 858 F.2d 1075, 1085-86 (5th Cir 1988), <u>cert. denied</u>, 490 U.S. 1047, <u>and</u> 491 U.S. 906 (1989).

This case is very different.  The Purchasers presented a multitude of claims covering a wide variety of transactions.  The jury made specific findings that the Jubies' RICO violations did not proximately cause the Purchasers damage.  Our standard of review is clear:  "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."  <u>Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.</u>, 369 U.S. 355, 364 (1962).  <u>See also</u> <u>Transport Ins. Co. v. Chrysler Corp.</u>, 71 F.3d 720, 722-23 (8th Cir. 1995).

Like the district court, we have no difficulty reconciling the jury's verdict on RICO damages with the evidence and its other findings.  The jury found that the Jubies breached fiduciary duties and violated RICO while they were in control of the Bank.  Indeed, the FDIC's regulatory findings strongly suggested that Jerry Jubie had seriously mismanaged the Bank.  But the jury also rejected the Purchasers' common law fraud and 10b-5 claims, which required a finding of reasonable reliance by the Bank's subsequent purchasers.  Consistent with these findings, the jurors doubtless concluded that pre-purchase RICO violations did not proximately cause damage to those who purchased the Bank because, with many months of pre-purchase access to the Bank's books and records and knowledge of the FDIC cease and desist Order, they should have known of this misconduct and adjusted the purchase price accordingly.

The Purchasers next argue that they deserve a new trial because the jury's damage award was grossly inadequate.  "Inadequacy of a verdict is a matter for the trial court, and we will not reverse a verdict on these grounds unless there has been plain injustice or a monstrous or shocking result."  <u>Ford v. El</u>

<u>Dorado & Wesson R.R.</u>, 848 F.2d 911, 914 (8th Cir. 1988). After careful review of the record, we conclude that the Purchasers cannot meet this rigorous standard. Virtually every aspect of this complex case was hotly contested at trial, particularly the Purchasers' damage claims that the Jubies successfully concealed numerous fraudulent or otherwise unsound pre-purchase transactions. The jury accepted some of these contentions and rejected others, as the conflicting evidence permitted. We agree with the district court that substantial evidence supports the verdict and a new trial is not required to prevent a miscarriage of justice.

### III. The Jubies' Counterclaim.

The Purchasers launch many attacks on the Jubies' substantial recovery under the Retirement Agreement. One is sound; the rest require little discussion. They first argue that the district court erred in refusing to void the Retirement Agreement because of the Jubies' statutory fraud and RICO violations. The district court rejected this contention because the Purchasers did not seek to rescind the Purchase Agreement. Instead, they affirmed the transaction, including the Bank's obligations under the Retirement Agreement, and sued to recover the benefit of their bargain. We agree. <u>See, e.g.</u>, Restatement of Contracts 2d § 380(2) (1981).

The Purchasers alternatively argue that their performance under the Retirement Agreement is excused by the jury's findings that the Jubies breached the Purchase Agreement. The district court rejected this "novel theory" on the ground that the Purchasers, having affirmed the contract, "are in no better position than the [Jubies] to be excused from the performance of their remaining contractual obligations." Again, we agree. Though specifically ratified in the Purchase Agreement, the Retirement Agreement was an independent covenant which the Jubies may enforce at the same time the Purchasers obtain the full benefit of their bargain under the Purchase Agreement. <u>See</u> 17A C.J.S. <u>Contracts</u>

§§ 344, 453 at 331-33, 571-72; McNeal-Edwards Co. v. Frank L. Young Co., 51 F.2d 699, 701 (1st Cir. 1931). The Purchasers' further contention that they did not breach the Retirement Agreement by ceasing to make monthly retirement payments flies in the face of the trial evidence construed in favor of the jury's verdict.

That brings us to the most difficult issue in the case, whether the Jubies may recover lump-sum future damages under a Retirement Agreement that contains no acceleration clause. Historically, contracts for installment payments of money have been excluded from the general rule that anticipatory repudiation of a contract permits the aggrieved party to sue for damages resulting from future as well as past non-performance. As the Supreme Court said in Roehm v. Horst, 178 U.S. 1, 17-18 (1900):

> In the case of an ordinary money contract, such as a promissory note, or a bond, the consideration has passed; there are no mutual obligations; and cases of that sort do not fall within the reason of the [anticipatory repudiation] rule. . . . [M]oney contracts, pure and simple, stand on a different footing from executory contracts for the purchase and sale of goods . . . .

This principle is recognized in the Restatement of Contracts 2d § 243(3). While some jurisdictions may have abandoned it, Minnesota has not. In Palmer v. Watson Constr. Co., 121 N.W.2d 62, 67 (Minn. 1963), the Minnesota Supreme Court declared, "We are committed in this state . . . to the rule that nonpayment of installment obligations is not in and of itself such prevention of performance as will make possible suit for loss of profits." In
Sheet Metal Workers Local No. 76 Credit Union v. Hufnagle, 295 N.W.2d 259, 263 (Minn. 1980), after quoting the above portion of Palmer, the Court said that perhaps "the exclusion of installment payment obligations from the anticipatory breach doctrine should be reconsidered," but it declined to reach that issue because there had been no unequivocal repudiation of the promissory note in question, and because Minnesota law, including Uniform Commercial

-7-

Code § 1-208, allows a creditor to solve "the problem created by the exclusion of installment payment contracts" from the anticipatory repudiation doctrine by including an acceleration clause in the installment payment contract.

In meeting our obligation under Erie to predict the development of Minnesota law, the temptation is to approach this issue in formulaic terms -- would the Minnesota Supreme Court now apply the anticipatory repudiation doctrine to all types of contracts, or would it continue to recognize an exception for installment payment contracts. However, we think that greater light is shed on the issue by taking Justice Cardozo's rather different approach in the pre-Erie case of New York Life Ins. Co. v. Viglas, 297 U.S. 672, 679-81 (1936):

> There may be times when justice requires that irrespective of repudiation or abandonment the sufferer from the breach shall be relieved of a duty to treat the contract as subsisting or to hold himself in readiness to perform it in the future. Generally this is so where the contract is a bilateral one with continuing obligations, as where a manufacturer has undertaken to deliver merchandise in instalments. . . . On the other hand, a party to a contract who has no longer any obligation of performance on his side but is in the position of an annuitant or a creditor exacting payment from a debtor, may be compelled to wait for the instalments as they severally mature, just as a landlord may not accelerate the rent for the residue of the term because the rent is in default for a month or for a year. . . . The root of any valid distinction is not in the difference between money and merchandise or . . . services. What counts decisively is the relation between the maintenance of the contract and the frustration of the ends it was expected to subserve. The ascertainment of this relation calls for something more than the mechanical application of a uniform formula.

(citations omitted). We read the Minnesota Supreme Court's discussion in Hufnagle as signaling that it would follow this more discriminating approach to the future damages issue in this case.

-8-

Under this approach, we conclude that the award of future damages cannot stand. The Retirement Agreement granted Jerry Jubie monthly payments for life as a mechanism to induce his retirement from active management and to promote sale of the Bank, as the FDIC was no doubt urging. The Bank stopped making monthly payments not because of insolvency or other impossibility, but because the Purchasers believed that Jubie's misconduct disentitled him to further retirement benefits. The Purchasers were wrong, and the Bank therefore owes Jubie all unpaid installments, with prejudgment interest.[2] But the Bank is not disabled from meeting its future Retirement Agreement obligations. And replacing fixed monthly future obligations with a large lump-sum judgment will adversely impact a struggling financial institution and seems entirely contrary to the original purposes of the Retirement Agreement. Finally, any risk of multiple lawsuits can be reduced, if not eliminated, by a judgment that declares valid, or even specifically enforces, future installment obligations. See 4 Corbin on Contracts § 969, at 893; Restatement of Contracts 2d §§ 243 comment d, 359(2) & comment b.

## IV. Attorney's Fees.

Finally, the Purchasers argue that the district court's $45,000 attorney's fee award for the Minnesota statutory violations is inadequate.[3] Based upon specific findings, the court awarded only a portion of the requested $159,820.25 in fees and $13,888.69 in costs because: 1) the Purchasers enjoyed only limited success;

---

[2]The Purchasers also argue that any award under the Retirement Agreement is subject to offsets under the Jubies' bad loan guarantees in the Purchase Agreement. We disagree. Given the claims pursued by the Purchasers in this lawsuit, the jury's damage award in their favor finally resolved all past and future claims relating to the guarantees in the Purchase Agreement.

[3]The Purchasers are not entitled to a fee award under RICO because the jury found no injury. See 18 U.S.C. § 1964(c); Farrar v. Hobby, 113 S. Ct. 566, 573-74 (1992).

2) they submitted inadequate billing records that did not break out time spent defending the Jubies' counterclaim; and 3) there was unnecessary and redundant billing.

In awarding fees under these statutes, Minnesota courts consider the results obtained critical to the award, particularly where a party has prevailed only on some claims or has been awarded only a fraction of the desired relief. Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 542 (Minn. 1986), citing Hensley v. Eckerhart, 461 U.S. 424, 434-36 (1983). Fee requests are also reduced for "hours not reasonably expended." Specialized Tours, 392 N.W. at 542, citing Hensley. Having carefully reviewed the record and the district court's detailed reasons for reducing the fee award in light of the Purchasers' limited success, we conclude that the fee award was not an abuse of discretion.

## V. Conclusion.

The portion of the district court's judgment awarding damages on the Retirement Agreement counterclaim is reversed and the case is remanded with directions to enter an amended judgment awarding compensatory damages (including interest) for all past-due installments plus an appropriate decree regarding future retirement installment obligations. The judgment of the district court is in all other respects affirmed.

A true copy.

    Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-