# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

No. 98-4155

| | | |
|---|---|---|
| DOUGLAS COUNTY BANK & TRUST CO., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Appeal from the United States |
| v. | ) | District Court for the |
| | ) | District of Nebraska |
| UNITED FINANCIAL INCORPORATED, | ) | |
| | ) | |
| Appellee. | ) | |

Submitted:   December 17, 1999

Filed :   March 22, 2000

Before MURPHY and MAGILL, Circuit Judges, and SMITH,[1] District Judge.

SMITH, District Judge

Douglas County Bank & Trust Co. ("DCB&T"), a Nebraska banking corporation, appeals the district court's[2] denial of DCB&T's motion for judgment as a matter of law or for a new trial, filed after a jury found for DCB&T on one count of fraudulent misrepresentation.   DCB&T asserts that the district court erred in not finding, as a matter of law, that the jury improperly

---

[1]The Honorable Ortrie D. Smith, United States District Court Judge for the Western District of Missouri sitting by designation.

[2]The Honorable William G. Cambridge, Chief Judge of the United States District Court for the District of Nebraska.

considered evidence in making its determination of damages, and that it should have set aside the jury's damage award. DCB&T alternatively contends, that the district court abused its discretion in failing to grant a new trial on that issue. We affirm.

**I.**

DCB&T operates a Mortgage Servicing Division as part of its banking business. It purchases, through a confidential bidding process, the right to collect principal and interest on individual mortgage loans that have been collected or pooled together into packages. As compensation for the administration of these loans, DCB&T keeps a portion of the income generated. These packages are sold in the secondary mortgage market to servicing entities, like DCB&T, through written offering circulars detailing the financial characteristics of these pooled mortgages.

United Financial Incorporated ("UFI"), a Colorado corporation, acts as a broker of pooled mortgage packages on behalf of different sellers. UFI creates offering circulars sent to potential customers. The information contained in the circulars is supplied by the seller.

The Government National Mortgage Association ("GNMA") is an agency of the federal government. It has primary responsibility for regulating mortgages based on federally established criteria. As part of its responsibilities, GNMA underwrites mortgage loans meeting certain standards. If loans do not meet these standards, including eligibility for and attainment of a Mortgage Insurance Certificate ("MIC"), such loans are not accepted into the GNMA program. Consequently, the entity that has purchased the right to service the loans is responsible for repayment of their full value if the borrower defaults.

2

On April 16, 1996, UFI sent a circular to DCB&T, offering for sale a $65,000,000 Florida GNMA mortgage portfolio. UFI was brokering the portfolio for Waters Mortgage Corporation ("WMC"), the seller. DCB&T unsuccessfully bid on this package.

The successful bidder notified UFI on May 24, 1996, that it refused to go forward with the sale due to the results of the bidder's due diligence investigation of the packaged mortgages. The bidder indicated that some of the loans lacked the MIC, an indication of the federal insurability of the loans. The bidder also indicated that some of the loans were delinquent in principal and interest payments. Following receipt of this notice, UFI and WMC decided to repackage the portfolio by eliminating certain loans. They created a new $49,000,000 offering. DCB&T was given the first opportunity to purchase the revised package without going through the bidding process.

On or about June 2, 1996, DCB&T called UFI to discuss the loan package's characteristics. DCB&T recognized the new package offering involved some of the same loans as the April 16, 1996 offering. UFI's representative confirmed that the package was derived from the previous offer and represented that the previous successful bidder could not obtain financing.

On or about June 3, 1996, DCB&T successfully bid on the package and agreed to pay WMC $147,000. On June 7, 1996, DCB&T wired the first payment of $73,500 to WMC. During mid-June, it began its due diligence evaluation of the mortgage package, a process that continued into July. On or about June 20, 1996, DCB&T's investigation revealed that many MICs were missing from the individual loan files. In fact, at least three hundred out of approximately one thousand loans lacked the appropriate MICs. After contacting UFI and WMC, DCB&T received assurances from WMC that the missing MICs existed and would be obtained in

3

the near future. After having been put on notice of the missing MICs, DCB&T wired the second payment of $73,500 to WMC on June 28, 1996.

DCB&T executed an assignment agreement with the seller on or about July 29, 1996, giving it the responsibility for servicing the loans from that day forward. On August 8, 1996, GNMA approved and consented to the assignment agreement. On or about August 15, 1996, DCB&T and WMC requested that GNMA allow them to withdraw certain loans from the transaction since the loans could not be certified within the required period of time.

Pursuant to government policy, GNMA refused to withdraw the uncertified loans from its acceptance of transfer. DCB&T negotiated with GNMA to reach a settlement whereby GNMA would accept the suspect mortgage loans in return for DCB&T's payment of $1.4 million and the promise not to bid on GNMA packages for three years. To compound matters for DCB&T, it discovered that WMC was out of business and insolvent. DCB&T filed suit against UFI to recover the $1.4 million paid to GNMA and the $147,000 paid to the seller.

The claims presented to the jury consisted of the following: (1) material misrepresentation for statements printed in UFI's offering circular; (2) fraudulent concealment for failing to disclose to DCB&T certain relevant information UFI held regarding the mortgage loans in the package; and (3) fraudulent misrepresentation for knowingly making a false statement to an employee of DCB&T in connection with the sale. The jury found in favor of DCB&T only on the latter claim, involving the misrepresentation as to the first bidder's reason for not completing the transaction, and awarded damages in the amount of $75,000.

DCB&T filed a post-trial motion for judgment as a matter of law as to the amount of damages awarded.[3] Alternatively, DCB&T requested a new trial on the issue of damages because the verdict and the damage award are contrary to law. The district court denied the motions and allowed the jury verdict to stand on all counts. DCB&T appealed.

## II.

DCB&T argues that the district court erred when it denied its motion for judgment as a matter of law or, in the alternative, for a new trial. We review the district court's denial of a motion for judgment as a matter of law de novo using the same standards as the district court. Keenan v. Computer Associates International, 13 F.3d 1266, 1268 (8th Cir. 1994). A motion for judgment as a matter of law presents a legal question to the district court and this court on appeal: "[W]hether there is sufficient evidence to support the jury's verdict." Id. (quoting White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)). We view the "evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." Id.

A more deferential standard applies when we review a district court's denial of a motion for a new trial under Fed. R. Civ. Pro. 59(a). A "[district] court's decision will not be reversed by a court of appeals in the absence of a clear abuse of discretion." Lowe v. E.I. DuPont de Nemours & Co., 802 F.2d 310 (8th Cir. 1986); see also 10 Charles Alan Wright & Arthur R. Miller, & Kane, Federal Practice and Procedure, § 2818 (2d. Ed. 1987) (stating that a trial court

[3]DCB&T originally filed the motion as a judgment notwithstanding the verdict. However, the preferred terminology is "judgment as a matter of law." The Advisory Committee Notes for the 1991 amendments to Fed. R. Civ. Pro. 50 state that motions captioned as motion for judgment notwithstanding the verdict should be treated as motions for judgment as a matter of law. Procedurally, both motions are the same.

has broad discretion in granting a new trial and that the appellate court will defer a great deal to its exercise of this discretion).

### III. JUDGMENT AS A MATTER OF LAW

DCB&T contends that the district court should have found, as a matter of law, that the jury exceeded its authority and misapplied the law to the evidence before it. DCB&T argues that it was entitled to a greater award of damages than what the jury determined.

DCB&T asserts that it was entitled to recover the entire amount ($1,547,000) of alleged damages as a matter of law since the jury disregarded both the court's damage instruction and the evidence of damages offered by the plaintiff at trial. DCB&T failed to move for judgment as a matter of law before the case was submitted to the jury as required under Fed. R. Civ. Pro. 50(a) and (b); only after the jury reached its disappointing verdict did DCB&T file its motion. However, the district court found that the situation in this case - an award of damages smaller than anticipated by DCB&T - would be unpredictable until after the jury reached its decision. Therefore, the district court considered the motion.

A motion for judgment as a matter of law under Fed. R. Civ. Pro. 50 *requires* that the moving party make the motion prior to the time the case goes to the jury. We recognize several exceptions which may allow the merits of the motion to be heard, if the moving party fails to present a timely motion. The first exception allows a movant to challenge a jury verdict without moving for a judgment as a matter of law at the close of evidence if their earlier Rule 50(a) motion 1) was raised prior to the close of all of the evidence; and 2) the court indicated that the movant need not renew its motion under Rule 50(b) in order to preserve its right to challenge the verdict. Pulla v. Amoco Oil Co., 72 F.3d 648, 655 (8th Cir. 1995). The second exception excuses

6

the movant from complying with Rule 50 if no new evidence is presented after the original motion *and* that a tacit understanding exists that the movant need not renew its motion at the close of all the evidence. K&S Partnership v. Continental Bank, 127 F.R.D. 664, 666-667 (D. Neb. 1989), *aff'd* in part, *rev'd* in part, 952 F.2d 971 (8th Cir. 1991). The third exception occurs where a short period of time elapses between the movant's initial motion and the close of all evidence, but the movant fails to renew its motion as directed by Rule 50(b). BE & K Construction Co. v. United Brotherhood of Carpenters & Joiners of America, 90 F.3d 1318, 1325 (8th Cir. 1996).

In all of the listed exceptions, the movant made some type of motion for judgment as a matter of law before the case went to the jury. DCB&T made its motion for judgment as a matter of law after the jury returned with a verdict. Therefore, none of the listed exceptions apply nor should a new exception be crafted in this case. Permitting movants for any reason to make an initial motion for judgment as a matter of law after the return of the jury verdict deprives the nonmoving party the opportunity to cure the deficiency in their case, if any exists. Allowing the motion to go forward would set an unacceptable precedent.

Our holding on this point should not be interpreted as requiring DCB&T to have done the impossible and predict the jury's alleged errors. A Rule 50 motion is permitted "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue . . ." Fed. R. Civ. P. 50(a)(1). Theoretically, DCB&T could have filed a Rule 50 motion at the close of all the evidence – and before the jury retired – alleging that there was no evidentiary basis for the jury to conclude that the damages were less than the $1.4 million paid to GNMA and $147,000 paid to the seller and asking the trial judge to order the jury to return a verdict for that amount if it found that DCB&T

7

had been the victim of fraud. Of course, such a motion would have failed in this case because (as will be discussed in part IV herein), there was a legitimate factual dispute about the amount of damage caused by the fraud.

For the reasons stated above we affirm the district court's denial of appellant's motion for judgment as a matter of law.

## IV. MOTION FOR A NEW TRIAL

The authority to grant a new trial on a motion pursuant to Federal Rule of Civil Procedure 59 is within the discretion of the district court. Gray v. Bicknell, 86 F.3d 1472, 1480 (8th Cir. 1996). As stated earlier, a district court's denial of a motion for a new trial will not be reviewed unless there was a "clear abuse of discretion." See Keenan v. Computer Associates International, Inc., 13 F.3d 1250, 1269 (8th Cir. 1994). "[D]istrict courts enjoy broad discretion in choosing whether to grant a new trial, and thus, [appellate courts] accord great deference to their Rule 59 rulings." Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995) (quoting White v. Pence, 961 F.2d 776, 781 (8th Cir. 1992)). Where a district court's ruling is that the verdict was not against the weight of the evidence, the district court's denial of a Federal Rule of Civil Procedure 59 motion is virtually unassailable. Id. (citing Keenan, 13 F.3d at 1269).

DCB&T argues that the district court erred by failing to grant DCB&T's motion for a new trial. In support of that argument, DCB&T states that the verdict was contrary to Nebraska law and a miscarriage of justice.

A miscarriage of justice occurs when there is insufficient evidence to support the verdict. First State Bank of Floodwood v Jubie, 86 F.3d 755 (8th Cir. 1996). Like the district court, we have no difficulty reconciling the jury's verdict on the fraudulent misrepresentation claim with the

8

damage award of $75,000. The jury found that UFI made a fraudulent statement to DCB&T while in negotiation for the sale of a pooled mortgage service offering. The jury was charged with finding the damages that proximately resulted from UFI's misrepresentation. Under the district court's direction, the jury was free to consider whether and to what extent the claimed damages were proximately caused by DCB&T's own actions.

The evidence presented at trial showed that DCB&T lost the $147,000 paid as a deposit to the seller and the $1,4000,000 to GNMA. The $147,000 was divided into two payments of $73,500 on June 7, 1996 and $73,500 on June 28, 1996. The jury awarded DCB&T $75,000.

DCB&T contends: 1) that it established the amount of damages it suffered with certainty, 2) that it demonstrates the exercise of reasonable business judgment in entering into the settlement with GNMA and 3) that the evidence points to DCB&T's reliance on UFI's statement that the bid was available because of the previous buyer's financial condition. According to DCB&T, under Nebraska law all three contentions establish that the full amount of alleged damages should have been awarded. DCB&T also speculates that when the jury ignored the total amount of damages, the jury must have concluded that the appellant was contributorily negligent.

DCB&T correctly states that under Nebraska law, contributory negligence is not a permitted defense in fraudulent misrepresentation claims. Little v. Gillette, 218 Neb. 271, 354 N.W2d 147 (1984). In Little, the Supreme Court of Nebraska rejected the contributory negligence argument by the defendants, a bank and a real estate agent, that the plaintiff should have investigated defendants' fraudulent profit projections and thus, protected her interests before she purchased an unprofitable franchise restaurant. The court stated that such a defense is useless where an "absolute statement of fact is made and where an investigation elsewhere would be

9

necessary to disclose its falsity." Little v. Gillette, 218 Neb. 271, 276-277 (1984) (quoting Foley v. Holtry, 43 Neb. 133, 43, 61 N.W. 120 (1894)) (internal quotations omitted).

Based upon the court's instructions, the jury might reasonably have found that DCB&T was not justified in continuing the business deal, when the evidence indicated that the bank had notice that the offering was suspect before it made the June 28 payment. Between the time the first and second payments were made, DCB&T discovered that approximately one-third of the mortgages lacked the MICs. DCB&T was not new to bidding on pooled mortgages. The jury heard testimony that the bank president, Mr. King, had been involved in over 1500 of these transactions over a twenty-year career, so the jury could conclude DCB&T knew the implications of the absent MICs.

DCB&T believes that the jury should have awarded the entire amount of damages under Nebraska law. However, the jury could have concluded that DCB&T's reliance on the fraudulent statement stopped when it first found out the truth regarding the insurability of the pooled mortgage package. It is an accepted maxim of tort law that one who has expert knowledge and experience cannot rely on statements to the same extent as an ordinary person: "One who has acquired expert knowledge concerning the matter dealt with may be required to form his own judgment, rather than take the word of the defendant." W. Page Keeton et al., Prosser and Keaton on the Law of Torts, § 108 at 751-753 (5th Ed. 1984) (paraphrasing decisions from Puget Sound Nat'l Bank v. McMahon, 53 Wn.2d 51 (1958); Schmidt v. Landfield, 20 Ill.2d 89 (1960); and Poe v. Voss, 196 Va.. 821 (1955)). In addition, actual knowledge of true facts prevents a claim of fraud. DCB&T's own action stopped the accrual of damages.

DCB&T conditioned its purchase of the pooled mortgages offering on satisfactory results of its own due diligence.  Therefore, DCB&T could have withdrawn after June 20, 1996, when information concerning the missing MICs first came to the bank's attention, or it could have withdrawn anytime after the June 28, 1996 payment.  DCB&T became committed on July 29, 1996, when it entered into the assignment agreement from the seller to DCB&T.  Therefore, the jury's award of $75,000 was most likely, based on DCB&T's  June 7, 1996 payment made to WMC.  This payment occurred before the first indication that a large portion of the packaged mortgages were suspect.

This account of the jury's decision making process does not necessarily lead to a conclusion that the jury found DCB&T contributorily negligent. The jury did consider DCB&T's evidence and its representatives' testimony that the bank relied on the fraudulent representation. The jury was not compelled to believe it.  The jury could well have concluded that DCB&T was using this representation as a vehicle to escape a business deal gone bad.  As the district court theorized, perhaps the jury found that DCB&T's additional financial loss was caused by its own decision to continue the transaction even after learning about the missing MICS, rather than a proximate result of UFI's fraudulent misrepresentation.

We conclude that the jury's verdict is not contrary to law. We further conclude that there exists enough evidence that supports the jury's verdict and damage award.  A new trial would not further the interests of justice.  Accordingly, we conclude that the trial court did not err when it denied appellant's motion for a new trial.

11

## V. Conclusion

The judgment of the district court in denying the appellant's motion for a judgment as a matter of law and denying the appellant's motion for a new trial is affirmed in all respects.

A true Copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT