**David BURTON, Plaintiff,**

v.

**R.J. REYNOLDS TOBACCO COMPANY, Defendant.**

**No. 94–2202–JWL.**

United States District Court, D. Kansas.

June 21, 2002.

Kenneth B. McClain, Nicholas E. Mebruer, Nimrod T. Chapel, Jr., Donald H. Loudon, Jr., Scott B. Hall, Humphrey, Farrington, McClain & Edgar, Independence, MO, Gregory Leyh, Kansas City, MO, for David Burton.

M. Warren McCamish, Williamson & Cubbison, Kansas City, KS, Junius C. McElveen, Jr., Jones, Day, Reavis & Pogue, Washington, DC, Sydney Bosworth McDole, William E. Marple, Thomas C. Pavlik, Clay Alfred Hartmann, Stephen B. Yeager, Jones, Day, Reavis & Pogue, Dallas, TX, Stephen J. Kaczynski, Michael A. Nims, Paul G. Crist, Randal S. Baringer, Jones, Day, Reavis & Pogue, Cleveland, OH, Catherine L. Bjorck, Jones, Day Reavis & Pogue, Dallas, TX, for R.J. Reynolds Tobacco Co., Inc.

James D. Griffin, Blackwell Sanders Peper Martin LLP, Kansas City, MO, Frank C. Woodside, III, Mary-Jo Middelhoff, Dinsmore & Shohl LLP, Cincinnati, OH, Bruce G. Sheffler, James Mirro, Peter K. Eck, Nicholas Booke, Chadbourne & Parke LLP, New York, NY, James M. Warden Warden Triplett Grier, Overland Park, KS, for American Tobacco Co.

James D. Griffin, Blackwell Sanders Peper Martin LLP, Kansas City, MO, Frank C. Woodside, III, Mary-Jo Middelhoff, Dinsmore & Shohl LLP, Cincinnati, OH, for Brown and Williamson Tobacco Corp.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### ● Introduction

Plaintiff filed this personal injury products liability action against defendant R.J.

Reynolds Tobacco Company ("Reynolds") claiming that defendant's cigarettes caused his peripheral vascular disease ("PVD") and addiction. Plaintiff asserted that Reynolds manufactured a defective product, failed to warn him that smoking causes addiction and PVD, negligently failed to test or research its product, fraudulently concealed the fact that smoking cigarettes causes addiction and PVD, and conspired with other members of the tobacco industry to fraudulently conceal the health effects of smoking. The case proceeded to trial and, on February 22, 2002, the jury returned a verdict in favor of defendant on plaintiff's design defect and conspiracy claims and in favor of plaintiff on the claims for failure to warn, negligent testing and research and fraudulent concealment. The jury awarded plaintiff $196,416 in compensatory damages and authorized the court to impose punitive damages. On May 16, 2002, pursuant to K.S.A. § 60–3702, the court held a hearing to determine the amount of punitive damages to be awarded to plaintiff.

■ Having considered all of the evidence introduced in the trial of this case and the additional evidence which was admitted at the hearing on punitive damages, as well as the papers filed by the parties and the arguments of counsel, the court is now prepared to issue its ruling concerning the amount to be awarded as punitive damages in this case. For the reasons set forth below, the court directs the Clerk of the Court to modify and amend the judgment previously entered in this case to award plaintiff punitive damages in the amount of $15,000,000.

● **Discussion**

● **Overview**

The court has carefully evaluated the seven factors listed in K.S.A. § 60–3702(b) as factors which the court "may" consider at a proceeding to determine the amount of punitive damages to be awarded. In addition, recognizing that these factors are not exclusive, *Scheufler v. General Host Corp.*, 915 F.Supp. 236, 241 (D.Kan.1995); *Citizens State Bank v. Shearson Lehman Brothers, Inc.*, 874 F.Supp. 307, 310 (D.Kan.1994); *Patton v. TIC United Corp.*, 859 F.Supp. 509, 513 (D.Kan.1994), and that they should not be applied purely mechanistically, *Shearson*, 874 F.Supp. at 310, the court has attempted to focus on the gravamen of the conduct for which punitive damages have been determined appropriate by the jury in order to carry out the purposes for which the people of the State of Kansas, acting through their legislature, have authorized the assessment of punitive damages.

In this case, the jury found that the defendant R.J. Reynolds should be punished for its fraudulent concealment of information concerning the addictive nature of its product and its propensity to cause PVD. That conduct should be evaluated not only standing alone but, from the perspective of determining the punishable state of mind of the defendant, also in the context of the overwhelming evidence of its determination to withhold, mislead and deceive the public about the dangers of its product, thereby depriving the public of the opportunity to make a free and knowing decision about whether or not to smoke, how much to smoke and how difficult quitting smoking might be. Thus, as the jury found here, it is not for making a dangerous product that defendant should be punished. It is for concealing how dangerous the product is that R.J. Reynolds merits punishment.

Throughout this case the defendant vigorously proclaimed that smoking cigarettes is a choice, that people have been aware of its dangers for years, and that a person who smokes should be deemed to have assumed the risks associated with smok-

ing. If Reynolds had made full disclosure, that argument would have great appeal in a free society. But, a free society where people are permitted to engage in conduct which may not always be beneficial or healthful to them depends on the manufacturers and purveyors of the products which people choose to consume being frank and open about the dangers of which they are aware in order to permit truly free choice. Here, the insidious nature of Reynolds' fraudulent concealment lies not only in the evidence of its bare failure to disclose vital information but also in the evidence of its campaign to obscure the public's ability to appreciate the risks of smoking by attacking the credibility of the public health community's concerns while at the same time withholding and ignoring evidence which was within its control that would have made the truth available to consumers.

The fact that Reynolds concealed the addictive nature of tobacco is particularly nefarious. The evidence established that Reynolds recognized many years ago that the company was in the nicotine delivery business and that without the addictive qualities of nicotine people would not consume the company's product, or certainly not to the extent that has made the company highly profitable. Even if the causal relationship between PVD and smoking had been disclosed, concealment of the fact that smoking, once begun, is no longer a free choice, but rather is one that is driven by the pharmacological effects of nicotine, would have substantially undercut the value of the knowledge of other harmful propensities of tobacco. That, the evidence established, was precisely the plight of Mr. Burton. He was unwilling and unable to quit smoking, even as he experienced smoking's deleterious effects, because of the hold of an addiction on him which he did not realize had been foisted upon him and which might require more than sheer willpower to break. That is why the jury,

in all likelihood, thought Reynolds should be punished. This court agrees.

- **The Factors**

- **Likelihood at the time of misconduct that serious harm would arise from defendant's misconduct**

Concealment of the addictive nature of nicotine in the context of the knowledge by Reynolds of its health-related dangers, including specifically the causal relationship with PVD, brought with it a high likelihood at the time of the misconduct that serious harm would arise. Here, of course, serious harm-very foreseeable serious harm-occurred to Mr. Burton. He became addicted to a product which he consumed to the point that it caused him to so lose circulation in his legs that they both had to be amputated. This factor weighs heavily against Reynolds. It did not deceive him about facts which might affect the value of a luxury automobile, for example. It engaged in misconduct which consisted of specifically withholding information about how seriously harmful the product is to the persons of those enticed to use it.

In its submission to the court, Reynolds attempts to reargue its position that the evidence indicated that its concealment did not cause Mr. Burton's case of PVD. The jury found that it did and the court upheld the jury's verdict in its May 9, 2002 order. The court, thus, rejects Reynold's reassertion of the argument that the evidence it concealed would not likely have impacted whether Mr. Burton would have started or stopped smoking. The jury found otherwise and the court agrees.

- **Degree of the defendant's awareness of that likelihood**

The direct evidence on this point was not extensive. But, Reynolds had to have been aware of that likelihood. In fact, why else would Reynolds have concealed it

except to hide from consumers the true nature of the risks of buying and using its product? This factor weighs heavily against Reynolds.[1]

● **Profitability of the misconduct**

Reynolds is hugely profitable. Reynolds disclosed that it realized $505 million in net income in 2001, had over $1 billion in cash and cash equivalents and over $9 billion in stockholder equity. Plaintiff's expert testified that over the period from 1953 to 2001, Reynolds realized $34.6 billion in operating profit. While Reynolds presented expert testimony indicating that this figure was somewhat inflated because it included some profit from non-tobacco operations, an amount which Reynolds never quantified, and reflected operating profit instead of net income, there is no question that Reynolds reaped enormous profits from the sale of its cigarettes.

The court infers from the evidence that but for Reynold's misconduct, fewer people would have begun to smoke and those who had begun but desired to quit would have realized that the task might involve professional help. Knowledge that a product is not only risky to your health but also is addictive would seem to be a severe deterrent to consumption. The evidence does not permit a precise estimate of how many fewer cigarettes Reynolds would have sold

had it been honest about the choice its potential consumers were asked to make. But, the vigor with which Reynolds pursued its campaign of concealment and obfuscation leads this court to the conclusion that the profitability of the misconduct was high.

● **Duration of the misconduct and any concealment of it**

The evidence established that the misconduct endured for decades.[2] The misconduct itself consisted of fraudulent concealment. Moreover, the defendant's dogged determination to deny the addictive effects and to deny that there is more than a statistical relationship between smoking and PVD amount to a continued perpetuation of concealment. These factors weigh against Reynolds.

● **Attitude and conduct of the defendant upon discovery of the misconduct**

The evidence does not reflect that Reynolds has repented of its ways. Its only grudging-and questionably sincere-concessions to the scientific evidence have been wrung from it through settlements of hotly contested lawsuits. It persists in its free choice mantra. Reynolds has not even said in any sincere and convincing fashion that it is sorry for what it did or for what happened to Mr. Burton. In many respects, this is the most disturbing aspect of

---

1. In its papers Reynolds again reasserts its arguments regarding causation that the jury rejected.

2. In its submission to the court, Reynolds argues that any concealment occurring after 1969 is preempted and, thus, the concealment ended in 1969. The court rejected this argument in its March 10, 1995 order and will not now revisit the matter.

Reynolds also argues that the concealment regarding addiction ended with the publication of the 1988 Surgeon General's report on smoking and that the concealment regarding PVD ended with the 1971 Surgeon General's report. The court does not agree. The evidence indicated that after the public health community realized that smoking is addictive and causes PVD, Reynolds concealed the information from the public by engaging in the "open question" campaign and through research at what was described in the evidence as a "front," known as the Council on Tobacco Research, designed to create the impression that smoking was not harmful. As plaintiff's expert witnesses testified, Reynolds' efforts impaired the ability of the Surgeon General and public health community to inform the public of the health effects of smoking, including that smoking was addictive and causes PVD.

this case and one which merits stiff punishment.

### ● Financial condition of defendant

Reynolds disclosed that it realized $505 million in net income in 2001, had over $1 billion in cash and cash equivalents and over $9 billion in stockholder equity.[3] There can be no question that Reynolds can afford to pay the maximum award authorized by law. Moreover, the sheer magnitude of Reynold's wealth makes it imperative that the award be in an amount which is high enough to have at least some impact in order to carry out the statutory purposes of punishment and deterrence.

### ● Total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct

Reynolds points to the agreement settling claims brought by numerous states against Reynolds and other cigarette manufacturers, including a claim that defendants made false statements about the health risks of smoking. According to Reynolds, the settlement requires the payment of billions of dollars, including approximately $1.6 billion to be paid to Kansas over the course of 25 years. Reynolds estimates that its share of the payments to Kansas will be $400 million. In addition, Reynolds points out that the settlement agreement places restrictions on Reynold's marketing practices.

As plaintiff points out, Reynolds' 1999 Form 10–K, filed with the Securities and Exchange Commission, indicates that the cost of the settlement has been "primarily funded through price increases" of its cigarettes. The ability to absorb such a large cost without hurting profitability is illustrative of the addictive nature of cigarettes and the grip that smoking holds on Reynolds' customers. While the settlement placed substantial financial burdens on Reynolds, the court concludes that the deterrent effect was relatively minor because Reynolds suffered little impact on its profitability. Instead, Reynolds' customers, who suffered from Reynolds' concealment, have been primarily forced to bear the cost of the settlement agreement.[4] The court concludes that this factor does not weigh against a significant award of punitive damages.[5]

### ● Other considerations

Litigation expenses incurred, including attorney fees, is an additional factor that the court may consider in awarding punitive damages. *Smith v. Printup*, 262 Kan. 587, 601, 938 P.2d 1261 (1997); *Wardrip v. Hart*, 949 F.Supp. 801, 803 (D.Kan.1996); *Scheufler v. General Host Corp.*, 915 F.Supp. 236, 243 (D.Kan.1995). In this case, the expense to plaintiff in prosecuting the case was substantial. The evidence indicates that counsel for plaintiff

---

**3.** Based on the evidence presented at the hearing, the court agrees with Reynolds that it is appropriate to consider the 2001 financial information for RJ Reynolds Tobacco Company as opposed to the financial information for RJ Reynolds Tobacco Holdings, Inc.

**4.** The court does not agree with Reynolds' characterization of plaintiff's argument as being that Reynolds must "become insolvent or at least become a failing enterprise, in order to establish that prior damages awards and other measures are successful deterrents." Instead, the court understands the argument as being that if Reynolds simply passes the cost of the settlement on to consumers instead

of realizing an impact on profitability, Reynolds has been able to avoid punishment and, thus, there has been little deterrent effect. The court agrees with that proposition.

**5.** While Reynolds discloses two other cases in which it was assessed punitive damages at trial, Reynolds concedes that those awards have not been paid and are on appeal. Also, Reynolds has not shown that the claims in those cases involved concealment of the fact that smoking is addictive and causes PVD. The cases did not arise out of conduct occurring in Kansas and, thus, they do not signify that Kansas has satisfied its interest in punishing the conduct in this case.

incurred costs of over $390,000 and spent almost 10,000 hours working on the case. The extraordinary cost of litigation is explained by the long and hotly contested discovery phase of the case. The court does not punish Reynolds for its vigorous defense or for asserting claims of privilege during discovery. Those were litigation decisions Reynolds was free to make. The court notes, however, that the extraordinary cost of litigation incurred by plaintiff and his counsel is directly attributable to those decisions and that, under Kansas law, the substantial litigation cost is a factor weighing in favor of a significant punitive damages award.

Reynolds argues that the high litigation costs should not be considered because counsel for plaintiff benefitted from the discovery in other cases. The evidence indicated that the hours billed on this case did not overlap with the hours billed in other tobacco cases in which plaintiff's counsel was involved. In addition, even if counsel derived some benefit in other cases, even if significant, the cost in prosecuting this case was extraordinary. The court simply is not persuaded that because plaintiff's counsel was successful in other cases and may have benefitted in those cases from the experience gained in prosecuting this case and from the documents discovered in this case, the extraordinary cost of prosecuting this case does not still weigh in favor of a significant punitive damage award.

- **Limitations on punitive damages**

- **Statutory**

Reynolds argues that the punitive damages award is limited to $5 million by K.S.A. § 60–3702(e). The statute limits the award of punitive damages to the lesser of the gross annual income of the defendant or $5 million unless "the court finds that the profitability of the defendant's misconduct exceeds or is expected to exceed the limitation...." If the court so finds, "the limitation on the amount of exemplary or punitive damages which the court may award shall be an amount equal to 1 1/2 times the amount of profit which the defendant gained or is expected to gain as a result of the defendant's misconduct." In this case, the parties agree that the defendant's gross annual income exceeds $5 million and, thus, the applicable limitation is $5 million absent a finding by the court that the profitability of defendant's misconduct exceeds $5 million.

In *Gillespie v. Seymour*, 255 Kan. 774, 877 P.2d 409 (Kan.1994), the Kansas Supreme Court discussed the meaning of "profit" under the Kansas punitive damage statute. The court pointed to "the common understanding that profit is gain over expenditure" and held that, as used in the Kansas punitive damage statute, "it has a broader meaning." *Id.* at 784, 877 P.2d 409. According to the court, in product liability cases, " 'profit' involves looking at the defendant's profit from the course of conduct giving rise to the plaintiff's injuries." *Id.* The court cited a decision by the Kansas Court of Appeals in *U.S.D. No. 490 v. Celotex*, 6 Kan.App.2d 346, 629 P.2d 196 (1981) as an example. In *Celotex*, the defendant was sued for fraud and breach of warranty arising out of the sale of its two-ply roofing system. According to the court of appeals, the evidence presented at trial showed "a calculated nationwide course of conduct" during which the defendant "realized enormous profits." *Id.* at 356, 629 P.2d 196. Following *Gillespie*, and especially in light of the court's citation of *Celotex* as an example, this court believes that under the Kansas Supreme Court's interpretation of the statute, the profitability that this court must consider is the gain realized by Reynolds from the course of conduct giving rise to plaintiff's injuries.

Decisions analyzing "the profitability of the defendant's misconduct" as a factor to be considered in assessing punitive damages support the court's conclusion. For example, in *Sanjuan v. IBP, Inc.*, 78 F.Supp.2d 1195 (D.Kan.1999), the court awarded punitive damages based on an employee's claim that he was discharged in retaliation for filing a worker's compensation claim. In analyzing the "profitability of the defendant's misconduct," the court looked at the defendant's bonus program that encouraged retaliatory discharge. *Id.* at 1197. The court's analysis was not limited to the profitability of terminating the plaintiff, but instead, focused on the course of conduct giving rise to plaintiff's termination. Other decisions take the same approach. *See, e.g., Ramirez v. IBP, Inc.*, 950 F.Supp. 1074, 1079 (D.Kan.1996) ("In one respect, this factor focuses on the savings to the defendant in firing the plaintiff as opposed to retaining her and dealing with her injuries and insurance claims. The analysis, however, does not end there.... The evaluation of profit is not limited to the particular transaction or incident on which the suit was brought."); *Citizens State Bank v. Shearson Lehman Brothers, Inc.*, 874 F.Supp. 307, 312 (D.Kan.1994) (considering both the profit from the specific misconduct and the profit from the larger course of conduct).

■ The evidence presented at trial showed that the course of conduct that caused plaintiff's injuries involved concealing from the public that smoking is addictive and causes PVD. As the court has explained, the evidence permits an inference that fewer people would have begun to smoke but for Reynolds' concealment. Evidence presented at trial showed that the rate of smoking among the public dipped after the concerns about smoking and cancer were first raised but increased again upon the initiation of the "open question" campaign by Reynolds. The evidence also showed that Reynolds reaped enormous profits from the sale of cigarettes over the course of its concealment. Based on the evidence presented at trial and at the punitive damages hearing, the court concludes that the profitability of Reynolds' course of conduct far exceeded $5 million dollars. In fact, the court concludes that the profitability far exceeded $15 million dollars. Thus, the statutory limitation on punitive damages exceeds $15 million dollars and is not implicated by the court's award of punitive damages.

● **Constitutional**

■ Reynolds argues that the principles set out in *BMW v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) "severely limit the amount of punitive damages that Mr. Burton may recover in this case." According to Reynolds, these principles indicate "that any punitive damages award should be modest at best, and far below the $5 million minimum proposed by Mr. Burton." The court does not agree. As discussed below, an award of $15 million in punitive damages is within the range permitted by the principles set out in *Gore.*

● **Conduct occurring within Kansas**

According to *Gore*, a punitive damages award must relate to conduct occurring within the state. *Continental Trend Resources, Inc. v. OXY USA, Inc.*, 101 F.3d 634 (10th Cir.1996) (summarizing and interpreting the *Gore* decision). Reynolds correctly points out that plaintiff's submission to the court on the topic of punitive damages frequently refers to harm inflicted on society at large and that the court may not base a punitive damages award on such harm. The court did not consider the harm inflicted on society at large in reaching the decision to award $15 million in punitive damages. Instead, the court considered only Reynolds conduct as it was relevant to the State of Kansas.

The evidence presented at trial showed that Reynolds concealed from the residents of the State of Kansas the fact that smoking was addictive and causes PVD. Specifically, the evidence showed Reynolds knew that smoking was addictive and not only did not reveal this information but concealed it from the public. In addition, the evidence showed that Reynolds engaged in a campaign to cast doubt on the fact that smoking is harmful without any valid scientific basis for doing so. Prior to 1970 evidence existed showing that developing PVD was a risk of smoking and that in 1970 there was enough evidence for the public health community to decide that smoking causes PVD. The evidence also indicated, however, that, beginning in 1954 and continuing through at least the 1980s, defendants operated a public relations campaign which delivered the message to the public that whether smoking causes health problems remains an "open question." According to plaintiff's experts this "open question" campaign interfered with the ability of the public health community to effectively communicate to the public that smoking causes health problems. The evidence also indicated that part of this strategy was the creation of the Council on Tobacco Research ("CTR") and the use of the CTR to fund studies with the objective of creating the impression that there was still an open controversy about whether smoking causes health problems.

Because citizens of the State of Kansas were directly impacted by the tortious conduct of Reynolds, the State of Kansas has an interest in protecting its consumers and economy by punishing and deterring such behavior. See Gore, 517 U.S. at 572, 116 S.Ct. 1589 ("[T]he economic penalties that a State such as Alabama inflicts on those who transgresses its laws ... must be supported by the States's interest in protecting its own consumers and its own economy."). The court reached the $15 million punitive damage award by considering the harm to Kansas consumers and the Kansas economy only. Admittedly, the evidence showed that Reynolds concealed from the entire nation, not just from Kansas residents, that smoking was addictive and causes PVD. The court, however, did not consider the interests of other states in punishing and deterring such conduct. Had the court done so, it would have had a compelling basis to award punitive damages far in excess of $15 million.

To the extent that Reynolds' submission can be read to argue that the court can only consider concealment from Mr. Burton, as opposed to all Kansas residents, the court rejects the argument. The Gore decision explained that the reason a state may only award punitive damages based on conduct occurring within the state is that "no single State" has the power to "impose its own policy choice on neighboring States." Id. at 571, 116 S.Ct. 1589. Thus, each individual state must determine whether and how to punish and deter conduct impacting its citizens and economy. Id. Following the rationale of Gore, the State of Kansas is not limited to considering the tortious conduct of Reynolds as it relates to Mr. Burton but may consider the conduct as it relates to all Kansas consumers and the Kansas economy.

● **Notice of the severity of the penalty**

According to Gore, a defendant must receive fair notice "of the severity of the penalty that a State may impose." Id. at 574, 116 S.Ct. 1589. The Court set out three "guideposts" used to determine whether a defendant received fair notice of the severity of a punitive damages award: "The degree of reprehensibility of [defendant's conduct]; the disparity between the harm or potential harm suffered by [plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in

comparable cases." *Id.* at 574–75, 116 S.Ct. 1589. In its submission to the court, Reynolds ignores the first of the "guideposts," the degree of reprehensibility of Reynolds' conduct, and focuses on the ratio between the "actual harm" suffered by Mr. Burton and the award of punitive damages and potential civil or criminal penalties for its conduct. The court finds the first "guidepost" set out in *Gore* to be the most compelling and does not agree with how Reynolds evaluates the second two "guideposts."

According to the Supreme Court in *Gore,* "perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575, 116 S.Ct. 1589. Some wrongs, according to the Court, "are more blameworthy than others." *Id.* "Purely economic harm may warrant less punishment than harm to the health or safety of individuals." *Continental Trend,* 101 F.3d at 638. In evaluating this first "guidepost," the Tenth Circuit considers several factors, including whether the defendant's conduct "causes economic rather than physical harm; would be considered unlawfull in all states; involved repeated acts rather than a single one; is intentional; involves deliberate false statements rather than omissions; and is aimed at a vulnerable target." The court finds that all of these factors point to a conclusion that Reynolds' conduct was highly blameworthy and deserving of significant punishment.

The evidence showed that the harm inflicted by Reynolds' concealment of the fact that smoking was addictive and causes PVD was not purely economic. In Mr. Burton's case he suffered a debilitating personal injury. Expert testimony revealed that PVD is a painful disease that can ultimately lead to tissue death and amputation of extremities. In Mr. Burton's case, he lost both of his legs. Mr. Burton described terrible pain and suffering that resulted from his disease and subsequent amputations. As a double amputee, Mr. Burton lives a life of restrictions and is unable to participate in the physical activities that he testified that he very much enjoys. In addition, expert testimony indicated that Mr. Burton has substantial health care needs and is at risk of numerous health problems because of his now largely sedentary lifestyle. With regard to addiction, plaintiff's experts testified that an addicted smoker may be controlled by his addiction and find that quitting smoking is a difficult process that often requires multiple attempts before succeeding.[6]

Reynolds was found liable for fraudulent concealment, conduct which is actionable in all states. The evidence indicated that Reynolds acted intentionally to mislead the public about the harms of smoking over the course of decades. This was not a single nor isolated act but a massive and coordinated campaign. Testimony indicated that Reynolds made numerous false statements in furtherance of its goal. Documents revealed that Reynolds told the public that they would get to the bottom of concerns that smoking causes health problems. They funded the CTR and created the impression that the CTR was independent and would reveal to the public whether smoking was harmful. Instead, the evidence indicated that the CTR was not independent but was used to cast doubt on the fact that smoking was harmful.

As explained earlier, the evidence gives rise to an inference that fewer people

---

**6.** The court found plaintiff's expert witnesses on liability to be both extremely knowledgeable and credible. Defendant's expert witness, on the other hand, was a Reynolds employee who was a polished advocate for his company's cause, but lacked credibility.

would have begun to smoke but for Reynolds' concealment. Fewer Kansas residents, thus, would have suffered the pain of addiction and PVD. The evidence showed that Reynolds knowingly caused this suffering for the sake of profit. The court finds that Reynolds' conduct was extremely reprehensible. In the opinion of the court, all of the factors relevant to determining reprehensibility are present in this case. Thus, the first and "perhaps most important indicium of the reasonableness of a punitive damages award" points toward a significant award of punitive damages.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580, 116 S.Ct. 1589. Reynolds focuses on this "guidepost," pointing to decisions by the Supreme Court and Tenth Circuit approving or disapproving specific ratios. Reynolds does not discuss the relationship between the ratio and the type of damages sustained by the plaintiff or the reprehensibility of its conduct. As the Supreme Court explained in *Gore*, the Court "has consistently rejected the notion that the constitutional line is marked by a simple mathematical formula...." *Id.* at 582, 116 S.Ct. 1589. Instead, the Court explained that a general concern for reasonableness enters into the constitutional calculus. *Id.* at 583, 116 S.Ct. 1589.

In *Gore*, the discussion of the proper ratio was limited to "purely economic injury cases where injury is not hard to detect." *Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262, 1272 (10th Cir.2000). The Tenth Circuit has interpreted *Gore* to mean that in "economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ra-

tio." *OXY*, 101 F.3d at 639. This is not an economic injury case but a personal injury case. In cases "where the injury is primarily personal, a greater ratio may be appropriate." *Deters*, 202 F.3d at 1273. In addition, unlike an economic injury case, Mr. Burton's damages were not easily determined and translated into a dollar figure. Thus, the ratio between the compensatory damages awarded by the jury and the punitive damage award has less meaning and a higher ratio is justified. *Bielicki*, 225 F.3d at 1166 ("We likewise conclude that a high ratio is justified because the evidence establishes that 'the injury is hard to detect [and] the monetary value of noneconomic harm ... [is] difficult to determine.' ").

In this case, the jury awarded compensatory damages in the amount of $198,400. Using this figure, a $15 million punitive damage award creates a ratio of approximately 75 to 1. The court believes that such a ratio is appropriate given the extremely reprehensible nature of Reynolds' conduct. *FDIC v. Hamilton*, 122 F.3d 854, 861 (10th Cir.1997) ("To determine the proper ratio in a given case, [a court] must consider what the Supreme Court called '[p]erhaps the most important indicium of the reasonableness of a punitive damages award,' 'the degree of reprehensibility of the defendant's conduct.' "). With all factors relevant to reprehensibility pointing toward a large award and because Mr. Burton suffered personal injury, where damages are not easily determined and translated into a dollar figure, the court concludes that a ratio of 75 to 1 is not constitutionally impermissible.

"When determining the ratio of punitive damages to the harm caused, both actual and potential damages may be used to determine the harm." *United Phosphorus Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1230 (10th Cir.2000) (citing OXY, 101

F.3d at 639–40). Thus, the appropriate baseline for determining the ratio is not necessarily the jury's award of compensatory damages. In this case, concealment of the fact that smoking is addictive and causes PVD could have caused Mr. Burton to lose his arms as well as his legs. The evidence indicated that Mr. Burton was warned that if he did not stop smoking that he would also lose his arms to PVD. Thus, the potential harm from Reynolds' fraudulent concealment could have been much greater. In addition, the jury awarded Mr. Burton only damages for medical expenses and economic loss to date. The jury decided to not award noneconomic damages or damages for future economic loss. The jury made this decision despite the fact that the evidence indicated that Mr. Burton suffered significant pain and suffering and loss of his quality of life as a result of his injury. At the very least, this evidence indicates that the amount of potential damages were significantly higher than the compensatory damages awarded to Mr. Burton, including significant noneconomic harm. Upon reviewing the evidence, the court concludes that the potential damage to Mr. Burton as a result of Reynolds' conduct could exceed $1 million dollars, potentially being as high as several million dollars. Thus, the relevant ratio is more in the range of 15 to 1 or 5 to 1. Such a ratio is certainly not constitutionally impermissible.

The final "guidepost" set out in *Gore* is "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." 517 U.S. at 583, 116 S.Ct. 1589. Reynolds points to the Kansas Consumer Protection Act and that Kansas Criminal Code and argues that penalties under these statutes "are substantially lower than the amount of punitive damages sought by Mr. Burton in this case."

K.S.A. § 50–626 prohibits deceptive acts or practices in connection with a consumer transaction, including "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." K.S.A. § 50–626(b)(3). According to the comments to the statute, "[s]ubsection (b)(2) is intended to cover those cases where the supplier goes beyond innocent 'puffing' expected by the consumer" and "[s]ubsection (b)(3) makes it clear that the act covers not only affirmative misrepresentation, but omissions of fact as well." Each violation of the act "shall render the violator liable to the aggrieved consumer, or the state or a county as provided in subsection (c), for the payment of a civil penalty ... of not more than $10,000 for each violation." K.S.A. 50–636. In the case of Mr. Burton, the court believes that "each violation" under the statute would be a sale of cigarettes to Mr. Burton. The evidence indicates that Mr. Burton smoked at least one pack of cigarettes per week over the course of approximately 40 years. The evidence also showed that Reynolds fraudulently concealed that smoking was addictive and caused PVD for decades. If Mr. Burton or the Attorney General were to prosecute each violation of the act, the total fine under K.S.A. § 50–636 could amount to millions of dollars. Thus, the court believes that the statute actually supports an award of punitive damages as large as $15 million.

K.S.A. § 21–4403 prohibits deceptive commercial practices, including "use or employment by any person of any deception, fraud, false pretense, false promise, or knowing misrepresentation of a material fact, with the intent that others shall rely thereon in connection with the sale of any merchandise." K.S.A. § 21–4403(a). The criminal penalty imposed under the statute, as Reynolds points out, is a fine of up to $1,000 and up to six months in jail.

K.S.A. §§ 21–4403(d), 21–4502, 21–4503a. As with the Consumer Protection Act, the court believes that an offense occurs with each act of concealment made with the intent that others rely upon it in purchasing merchandise. The evidence showed that, for decades, Reynolds used deception to convince the public, including citizens of Kansas, that smoking did not risk significant health problems, such as addiction and PVD. If each act of deception committed in Kansas were prosecuted, the court believes that the fine would be substantial. In addition, a sentence of imprisonment is authorized by the statute. "[T]he authorization of imprisonment in the criminal context can justify a higher [punitive damage] award." *Bielicki*, 225 F.3d at 1166 (citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). An award in the range of $15 million seems reasonable when considering that the statute authorizes a term of imprisonment, especially given the number of violations that could have been prosecuted and the possibility that sentence be imposed consecutively for each violation of the act. In sum, the court believes that the statutes cited by Reynolds support a conclusion that a punitive damage award in the amount of $15 million is reasonable.

Looking to the three "guideposts" set out in *Gore* for guidance, the court concludes that an award of $15 million in punitive damages is reasonable and that Reynolds, therefore, received fair notice of the severity of the penalty that may be imposed. Specifically, the evidence supports a finding that Reynolds' conduct was extremely reprehensible, an award of $15 million of punitive damages does not create a ratio to the actual or potential harm inflicted on the plaintiff that is constitutionally impermissible, and civil and criminal penalties provided under Kansas law support the conclusion that an award of $15 million in punitive damages is reasonable.

IT IS THEREFORE ORDERED that the Clerk of the Court shall modify and amend the judgment previously entered in this case to award plaintiff punitive damages in the amount of $15,000,000.