# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3557

_____

| | | |
|---|---|---|
| Henry W. Boerner, Individually and as Administrator of the Estate of Mary Jane Boerner, Deceased, | * * * * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Arkansas. |
| | * | |
| Brown & Williamson Tobacco Company, | * * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 12, 2004
Filed: January 7, 2005

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Brown & Williamson Tobacco Company (B&W) appeals from the judgment entered by the district court[1] on the jury's verdict in favor of Henry W. Boerner (Boerner) on his design defect claim. We affirm, conditioned on Boerner's

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

acceptance of the remittitur ordered on the punitive damages portion of the jury's award.

## I.

Lung cancer was identified in the 1930s and its incidence rose sharply in that same decade. In 1941, Drs. Alton Oschner and Michael DeBakey published "Carcinoma of the Lung" in Archives of Surgery. The article noted the parallel rise in smoking and lung cancer, concluding that the latter was due mostly to the former, and included a lengthy bibliography of sources from multiple countries. In response, Edward Harlow, a chemist at the American Tobacco Company, circulated an internal memorandum. Referring to research funded or conducted by American Tobacco, Harlow predicted that impartial research would vindicate cigarettes but that "this would never be suspected by reading the extensive medical literature on tobacco." He also noted that the "medical profession is the group which it is most desired to reach and convince" and that the "tobacco industry is very much in need of some friendly research in this field." Plaintiff-Appellee's Ex. 19 at E-1 to E-2.

Ernest Wynder, while in his second year of medical school, began conducting surveys of cancer patients in 1947. Dr. Evarts Graham, the head of the surgery department at Washington University School of Medicine in St. Louis and the first person to successfully remove a whole lung from a human being, granted Wynder access to his wards in order to gather more data the following year. The Journal of the American Medical Association published Wynder's survey data in 1950. Wynder's compilations of case after case among a variety of groups showed that lung cancer was extremely rare in non or minimal smokers. He had also begun laboratory studies on mice that tended to support the linkage.

Wynder continued his research at the Sloan-Kettering Institute, a leading private center for cancer research in New York. American Tobacco, also based in New York, contributed funds to Sloan-Kettering through the Damon Runyan fund

and sought to intervene.  Recalling the events at a meeting of these two groups, Mr. Hiram Hanmer, the Research Director at American Tobacco, explained how he "told them we were disturbed about some of the activities" of Drs. Wynder and Graham. Dr. Rhoads of Sloan-Kettering replied that Dr. Wynder's work and publications could be controlled, but not his activities outside of work.

In the early 1950s, numerous studies agreed on the linkage and were widely disseminated in the press.  A forward-looking study by Dr. E. Cuyler Hammond of the American Cancer Society surveyed the smoking habits of 187,000 people and then monitored their health.  It obtained similar results in 1954 and 1957: the incidence of lung cancer was approximately 2000% higher among two-plus pack a day smokers as compared to nonsmokers. Critics alleged researcher bias, arguing that a linkage could be shown only by taking two groups of people and forcing one to smoke and the other to abstain.  Dr. Wynder replied as follows: "There are fields of human endeavor in which facts can be suppressed and at times submerged forever. Not so, however, in science . . . If one negates the value of statistics as part of scientific proof . . . and sets a goal for acceptable proof that is based upon impossible conditions, the very aim to resolve a given issue is paralyzed." An Appraisal of the Smoking-Lung-Cancer Issue, New Eng. J. Med. 1235 (June 15, 1961).  In 1962, President Kennedy inquired into the linkage, leading to a finding by the Surgeon General that smoking was related to lung cancer, at least in men.   In 1965, the Federal Cigarette Labeling and Advertising Act was passed, branding cigarette boxes with the words "Caution: Cigarette Smoking May be Hazardous to Your Health." Pub. L. No. 89-92, 79 Stat. 282, at § 4 (codified as amended at 15 U.S.C. §§ 133–1340 (2004)).

Mary Jane Boerner (Mrs. Boerner) began smoking in 1945 at the age of 15. But for a short initial period during which she smoked Lucky Strike cigarettes, she smoked only Pall Mall brand cigarettes until she quit smoking in 1981.  In 1996, she developed lung cancer.  In June of 1998, she and Boerner, her husband, filed this

lawsuit against B&W—the successor entity of American Tobacco, which was the manufacturer of the Pall Mall brand—alleging claims of failure to warn, design defect, violation of a voluntarily undertaken duty, fraud, and conspiracy to commit fraud. Following Mrs. Boerner's death in August 1999, the complaint was amended to include a wrongful death claim.

The district court granted B&W's motion for summary judgment as to all of the claims. On appeal, we affirmed in part, reversed in part, and remanded the design defect and pre-1969 failure to warn claims for trial. Boerner v. Brown & Williamson Tobacco Co., 260 F.3d 837 (8th Cir. 2001). On remand, B&W moved for judgment as a matter of law at the close of Boerner's case in chief. The district court denied the motion with respect to the failure to warn claim and reserved its decision on the design defect claim pending the jury's verdict. The jury found that the defective condition of Pall Mall cigarettes proximately caused Mrs. Boerner's illness and death, as well as the resulting injuries to Henry Boerner, and awarded $4,025,000 in compensatory damages and $15 million in punitive damages. The jury found for B&W on the pre-1969 failure to warn claim. The district court initially granted B&W's motion for judgment as a matter of law on the award of punitive damages, but reversed itself on reconsideration and reinstated the full jury award. B&W now raises four issues for our review on appeal.

## II.

We consider first B&W's contention that the district court improperly refused to grant its motions for judgment as a matter of law and for new trial. We review de novo the district court's denial of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to the prevailing party and making all reasonable inferences in favor of the jury's verdict. Douglas County Bank & Trust Co. v. United Financial Inc., 207 F.3d 473, 477 (8th Cir. 2000). We review for abuse of discretion the denial of a motion for new trial. Id.

To succeed on a design defect claim under Arkansas law, the plaintiff must establish that the product was in a defective condition, that the defective condition rendered the product unreasonably dangerous, and that the defect proximately caused the complained-of injury. Ark. Code Ann. § 4-86-102; Boerner I, 260 F.3d at 841. A product is unreasonably dangerous when it is dangerous "to an extent beyond that which would be contemplated by the ordinary and reasonable buyer, consumer, or user." Ark. Code. Ann. § 16-116-102(7); Boerner I, 260 F.3d at 841.

B&W offers two bases for reversal of the district court's denial of its motions. First, B&W contends that it was entitled to judgment as a matter of law because Boerner failed to present any evidence establishing the defective condition of Pall Mall cigarettes specifically, making instead only a categorical attack on cigarettes generally.

We conclude that there was sufficient evidence adduced at trial to support the jury's verdict on the design defect claim. Some evidence not specific to Pall Mall was indeed presented: cigarettes contain nicotine, which is addictive; cigarettes contain carcinogens; carcinogens are the causal link between smoking and cancer; and historically the average smoker did not fully appreciate the nature or severity of the health risks associated with smoking. There was also significant expert testimony, however, that related specifically to Mrs. Boerner's case and the Pall Mall brand. Dr. Peter Marvin, Mrs. Boerner's treating physician, testified that she died from the effects of cigarette smoke, and Dr. Marvin Blinder testified that she was addicted to Pall Mall cigarettes because of their nicotine content, which resulted in her cancer. Additionally, other evidence indicated that Pall Mall cigarettes had higher levels of carcinogenic tar than any other brand and that reduction of tar intake by smoking low tar cigarettes could have reduced the health risks associated with smoking. Similarly, the evidence indicated that Pall Mall cigarettes lacked effective filter technology, which would have reduced the level of carcinogenic tar inhaled into the lungs. Indeed, there was evidence that Pall Mall cigarettes utilized a "tobacco

-5-

filter" that actually increased the amount of tar taken into the body. Finally, Mrs. Boerner stated in her deposition testimony that she did not fully appreciate the extent of the potential health risks associated with smoking. This evidence was sufficient to provide a reasonable basis for the following findings by the jury: Pall Mall cigarettes were in a defective condition due to faulty design; the faulty design resulted in excessively high levels of carcinogens being introduced into Mrs. Boerner's lungs; the defective condition yielded the Paul Mall cigarettes unreasonably dangerous; and the defective condition proximately caused Mrs. Boerner's illness and death. Accordingly, we reject B&W's contention that Boerner's evidence constituted only a non-specific, categorical attack on cigarettes.

Next, B&W argues that it is entitled to judgment because, as a matter of law, Pall Mall cigarettes could not be unreasonably dangerous following the 1969 enactment of the Federal Cigarette Labeling and Advertising Act (Labeling Act), 15 U.S.C. § 1331 et seq. (as currently codified). B&W contends that the Labeling Act established the standard for notice to consumers of the dangerousness of cigarettes, with the result that any finding that a cigarette's dangerousness exceeded the required warning would be preempted by the Act. Once Congress has regulated aspects of the design, manufacture, or sale of a product, the doctrine of conflict preemption, including implied preemption, forecloses claims premised on such regulated aspects. Where there is an actual conflict between a state law cause of action and Congress's express policy, state law must give way under the Supremacy Clause. Geier v. American Honda Motor Car, Inc., 529 U.S. 861 (2000) (holding that a design defect claim based solely on a car's lack of an air bag was preempted because Congress provided manufacturers with the option of installing air bags or other passive safety devices). Boerner argues that the doctrine is inapplicable here because Congress has expressed an intent through the Labeling Act to preempt only those state law claims related to advertising or promotion and not those based upon design defects. Cipollone v. Liggett Group, Inc., 505 U.S. 502 (1992).

"We do not lightly deem state law to be superseded by federal law due to our solicitude for the states' exercise of their traditional police powers." Jones v. Vilsack, 272 F.3d 1030, 1033 (8th Cir. 2001) (citing Cipollone, 505 U.S. at 516). Congressional intent is the "ultimate touchstone" of the preemption inquiry. Id. (quoting Cipollone, 505 U.S. at 516). The clearest expression of congressional intent applicable here is a preemption clause included in the Labeling Act. 15 U.S.C. § 1334(b);[2] Jones, 272 F.3d at 1034. The language of the Labeling Act makes it clear that Congress intended to preempt only smoking-related laws "concerning the advertising or promotion of cigarettes." Jones, 272 F.3d at 1034. The statute is silent on the question of preemption of other state law causes of action. Because "Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not pre-empted," Cipollone, 505 U.S. at 517, we conclude that the doctrine of conflict preemption is inapposite in this case and that Boerner's claims are not foreclosed. Cf. Nat'l Bank of Commerce v. Dow Chemical Co., 165 F.3d 602 (8th Cir. 1999) (holding that federal labeling legislation does not preclude the possibility that a defect may occur in a particular product resulting in liability).

## III.

We turn next to B&W's contention that the district court erroneously admitted four reports of the Surgeon General pursuant to the public records exception to the hearsay rule, Fed. R. Evid. 803(8).[3]  B&W maintains that the reports were

---

[2]Section 1334(b) provides, in pertinent part, that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."

[3]The reports in question are: Smoking and Health, a Report of the Surgeon General, DHEW Pub. No. (PHS) 79-50066 (1979); The Health Consequences of Smoking, Nicotine Addiction, a Report of the Surgeon General, DHHS Pub. No. (CDC) 88-8406 (1988); Reducing the Health Consequences of Smoking, 25 Years of

inadmissible because their conclusions were not based on the independent investigation of a federal agency. In the alternative, B&W contends that the reports should have been ruled inadmissible under Fed. R. Evid. 403 because they were based on information that was not specific to the Pall Mall brand or to Mrs. Boerner's particular illness, and because B&W had no opportunity to cross-examine the reports' authors.

We review for abuse of discretion a district court's decision to admit evidence, Bergfeld v. Unimin Corp., 319 F.3d 350, 355 (8th Cir. 2003), and we conclude that the reports were properly admitted under the public records exception, inasmuch as they were prepared pursuant to a legal obligation. For instance, the 1989 Report was prepared in response to Congress's charge in Public Law 91-222 "to report new and current information on smoking and health to the U.S. Congress." The reports also include factual findings, although these were made by independent scientists and not on the basis of independent research by the Surgeon General. We have held, however, that similar reports based on non-agency research were properly admitted under the public records exception. See, e.g., Kehm v. Proctor & Gamble Mfg. Co., 724 F.2d 613 (8th Cir. 1983); see also Jones, 272 F.3d at 1035 (assuming the admissibility of a Report of the Surgeon General entitled "Preventing Tobacco Use Amongst Young People"). Once the evaluative report is shown to have been required by law and to have included factual findings, the burden is on the party opposing admission to demonstrate untrustworthiness. Kehm, 724 F.2d at 618. As to trustworthiness, we noted in Kehm that the author's unavailability for cross-examination does not render the report inadmissable, for the fact that a report was prepared by a disinterested governmental agency pursuant to a legal obligation constitutes a badge of trustworthiness. Id. B&W has made no affirmative showing

_____

Progress, a Report of the Surgeon General, DHHS Pub. No. (CDC) 89-8411 (1989); and Women and Smoking, a Report of the Surgeon General, DHHS Pub. No. (CDC) 01-6817 (2001).

that the reports are untrustworthy. The reports are final and thus are distinguishable from those at issue in a number of cases cited by B&W. See, e.g., Brown v. Sierra Nevada Memorial Miners Hospital, 849 F.2d 1186 (9th Cir. 1988).

## IV.

We turn to B&W's challenge to the district court's award of punitive damages. B&W proposes four bases for reversal of the award. First, B&W challenges the sufficiency of the evidence to warrant a punitive damages charge. We review de novo the district court's decision to instruct the jury on punitive damages. Carpenter v. Auto. Club Interinsurance Exch., 58 F.3d 1296, 1304 (8th Cir. 1995). Such a charge should not be submitted to the jury unless there is "substantial evidence" supporting the claim that the conduct was "malicious or done with the deliberate intent to injure another," Ellis v. Price, 990 S.W.2d 543, 548 (Ark. 1999), or was done with a "wanton and conscious disregard for the rights and safety of others." Dalrymple v. Fields, 633 S.W.2d 362, 363 (Ark. 1982). There was ample evidence adduced at trial to show that American Tobacco was aware, as early as the 1950s and 1960s, that cigarette smoke contained carcinogens, that cigarette smoke contained nicotine, that the risk of cancer increased with the amount exposure to carcinogens, that the risk of cancer could be reduced by the use of effective filter technology, and that nicotine addiction increased the likelihood of increased exposure to carcinogens. Despite this knowledge, the evidence indicates that American Tobacco manufactured, marketed, and sold Pall Mall cigarettes containing excessively high levels of carcinogenic tar and lacking effective filter technology, for and in the state of Arkansas; untruthfully represented that Pall Mall cigarettes were not unhealthy; untruthfully represented that cigarette smoking did not cause cancer; and actively attempted to suppress research into the harmful health consequences of cigarette smoking. The jury could reasonably have determined, based on this evidence and all reasonable inferences drawn therefrom, that American Tobacco acted with a conscious disregard for the safety of others. Accordingly, the district court did not

err in finding that the evidence justified submitting the punitive damages claim to the jury.

Second, B&W argues that it should not be liable for American Tobacco's conduct. Arkansas law, however, provides that the successor entity after a merger takes on all the liabilities of the predecessor companies. Ark. Code Ann. § 4-26-1005(b)(6).

Third, B&W contends that a punitive damages award in this case would not advance the policy objectives underlying the rule allowing for punitive damages and is therefore inappropriate. To support this contention, B&W argues as follows: the purpose of punitive damages is to punish the wrongdoer; the wrongdoer no longer exists in this case and no individuals who were in leadership positions at American Tobacco are in similar positions at B&W; and, accordingly, that there is no wrongdoer to punish. We are not persuaded. Punishment is only one of the policies underlying punitive damages. Deterrence is another. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) ("[P]unitive damages serve a broader function [than compensatory damages]; they are aimed at deterrence and retribution"); BMW of North America, Inc. v. Gore, 517 U.S. 559, 568 (1996) ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"). Under Arkansas law, a punitive damages award serves not only to "'deter similar conduct on the part of the particular tortfeasor,'" but also "'others who might be inclined to engage in such conduct.'" Robertson Oil Co. v. Phillips Petroleum Co., 14 F.3d 373, 378 (8th Cir.1993) (en banc) (quoting Ray Dodge, Inc. v. Moore, 479 S.W.2d 518, 523 (Ark. 1972)). Because B&W and other companies similar to it are still in the business of making and selling cigarettes, there is deterrent value in the punitive damages award.

Fourth, B&W argues that the amount of the award is excessive and therefore violative of state law and federal due process guarantees. Under Arkansas law, the question is whether the award "is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact." Routh Wrecker Service, Inc. v. Washington, 980 S.W.2d 240, 244 (Ark. 1998). Because the Arkansas courts employ the United States Supreme Court's due process analysis, we conflate both state and federal review. Stogsdill v. Healthmark Partners, L.L.C., 377 F.3d 827, 832 (8th Cir. 2004).

The Supreme Court has provided three guideposts for due process review of the amount of a punitive damages award: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between actual or potential harm suffered and the punitive damages award (often stated as a ratio between the amount of the compensatory damages award and the punitive damages award); and (3) the difference between the punitive damages award and the civil penalties authorized in comparable cases. Gore, 517 U.S. at 574-75. B&W argues that there is no evidence of reprehensibility, that the award does not bear a reasonable relationship to the compensatory damages, and that the $15 million award is vastly greater than the possible $10,000 penalty for a violation of the Labeling Act. Boerner responds that B&W's conduct was particularly reprehensible: it resulted in physical harm; evinced indifference to the health and safety of others; involved repeated incidents; and was the result of deceit (illustrated by American Tobacco's efforts to stifle anti-tobacco research and publication as well as its officers' practice of making public statements contending that smoking was not a health risk). Second, he argues that the ratio–less than 4 to 1–is well within the acceptable range established by the Supreme Court. Third, Boerner argues that the Labeling Act's penalty provision is inapplicable because the jury did not base its award on a failure to warn. He instead cites as a more apt comparison the potential financial consequences of an injunction barring further sale of the defective product.

-11-

The degree of reprehensibility is the "'most important indicium of the reasonableness of a punitive damages award.'" State Farm, 538 U.S. at 419 (quoting Gore, 517 U.S. at 575). The evidence at trial indicated that American Tobacco's conduct was highly reprehensible: Pall Mall cigarettes were extremely carcinogenic and extremely addictive—substantially more so than other types of cigarettes; the sale of this defective product occurred repeatedly over the course of many years despite American Tobacco's knowledge that the product was dangerous to the user's health; and American Tobacco actively misled consumers about the health risks associated with smoking. Moreover, the reprehensible conduct was shown to relate directly to the harm suffered by Mrs. Boerner: a most painful, lingering death following extensive surgery.

In light of the second Gore guidepost, however, we conclude that the punitive damages award is excessive when measured against the substantial compensatory damages award. Though the Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio between harm . . . to the plaintiff and the punitive damages award," id. at 424, it has identified a circumstance in which caution is required: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. at 425. As the Supreme Court noted in Gore, there is no "simple mathematical formula" that marks the constitutional line. 517 U.S. at 582. See also State Farm, 538 U.S. at 425 ("[W]e decline again to impose a bright-line ratio which a punitive damages award cannot exceed"). Notwithstanding the absence of a simple formula or bright-line ratio, the general contours of our past decisions lead to the conclusion that a low ratio is called for here. See Williams v. ConAgra Poultry Co., 378 F.3d 790 (8th Cir. 2004) (remitting the punitive damages award to an amount equal to the compensatory damages award of $600,000); Stogsdill, 377 F.3d at 834 (approving a ratio of 1:4 compensatory damages to punitive damages as an upper limit where the compensatory award was $500,000); Morse v. Southern Union Co.,

174 F.3d 917, 925-26 (8th Cir. 1999) (upholding close to a 1:6 ratio where the compensatory award was only $70,000).

Factors that justify a higher ratio, such as the presence of an "injury that is hard to detect" or a "particularly egregious act [that] has resulted in only a small amount of economic damages," are absent here. See Gore, 517 U.S. at 582. We also note that, despite evidence that American Tobacco exhibited a callous disregard for the adverse health consequences of smoking, there is no evidence that anyone at American Tobacco intended to victimize its customers. Cf. Eden Electrical, Ltd. v. Amana Co., 370 F.3d 824, 829 (8th Cir. 2004) (affirming an award of punitive damages approximately 4.5 times greater than the compensatory damages award where the defendant had devised a scheme of fraud and evinced an intent to "f***" and "kill" the plaintiff's business).

Accordingly, given the $4,025,000 compensatory damages award in this case, we conclude that a ratio of approximately 1:1 would comport with the requirements of due process. Thus, we conclude that the punitive damages award must be remitted from $15 million to $5 million.

## V.

Finally, we consider B&W's argument that the district court's jury instructions were erroneous. We review a district court's decisions on jury instructions for abuse of discretion, looking to the instructions as a whole to determine whether they fairly submitted the issues to the jury. Brown v. Sandals Resorts Intern., 284 F.3d 949, 953 (8th Cir. 2002). B&W argues that by failing to instruct the jury that it could consider only the harm to Mrs. Boerner and B&W's conduct in Arkansas, the district court violated the Supreme Court's requirement in State Farm that a "jury must be instructed . . . that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." 538 U.S. at 422. We conclude that the district court's instructions properly limited the jury's

inquiry to only those facts relevant to Boerner's claimed injuries, which had the practical effect of preventing the jury from punishing B&W for conduct unrelated to his claims.[4]  Additionally, there is no indication in the record that B&W's conduct would have been lawful elsewhere, so we need not be concerned with the possibility that B&W was punished for conduct that would have been legal where it occurred.

## VI.

We conditionally affirm the judgment entered on the verdict, subject to Boerner's acceptance of a remittitur judgment on the punitive damages award in the amount of $5 million.  Absent his acceptance of the remittitur, we reverse and remand for a new trial on the claim for punitive damages.

BYE, Circuit Judge, concurring in the result.

I concur in affirming the district court with the condition Mr. Boerner accept a remittitur on the punitive damage award.  Because I reach such result on different grounds, I write separately to explain my position.

I

I disagree with the Court's analysis regarding the excessiveness of this punitive damage award.  In Eden Electrical, Ltd. v. Amana Co., 370 F.3d 824, 829 (8th Cir.

---

[4]Cf. State Farm, 538 U.S. at 422 ("For a more fundamental reason, however, the Utah courts erred . . . :  The Courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm"); ConAgra Poultry, 378 F.3d 790 (concluding that due process had been violated where the district court upheld a punitive damages award on the basis of evidence of misconduct unrelated to the particular claim at issue).  "In assessing responsibility. . . it is crucial that a court focus on the conduct related to the plaintiff's claim rather than the conduct of the defendant in general."  Id. at 797.

2004), we affirmed a punitive damage award approximately 4.5 times greater than the compensatory damage award, despite the substantiality of the latter. To be sure, Eden's 4.5:1 ratio may crowd constitutional limits. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."). But it does not exceed the single-digit ratio the Supreme Court has intimated as setting the constitutional limit for all cases, id., save those where "'a particularly egregious act has resulted in only a small amount of economic damages [or where] the injury is hard to detect or the monetary value of noneconomic harm may have been difficult to determine,'" id. (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 582 (1996)), and we justified the 4.5:1 ratio in Eden because the case involved an "extraordinarily reprehensible scheme to defraud." Eden, 370 F.3d at 829.

Here, the ratio between compensatory and punitive damages is less than four to one, and I have trouble reconciling a reduction in this award with our affirmance in Eden. The Court distinguishes Eden on the grounds Amana "intended to victimize" Eden, while American Tobacco merely "exhibited a callous disregard for the adverse health consequences of smoking." Ante at 13. I find the rationale less than satisfying. Eden involved purely economic harm. This case not only involves personal injury rather than economic harm, but personal injury of a very serious nature – a wrongful death. Thus, while American Tobacco's level of intent may not be quite as egregious as Amana's (and even that is arguable), the consequence of its conduct far outweighs any considerations tied to its marginally less culpable state of mind. We have more reason to be outraged by American Tobacco's callous disregard for Mary Jane Boerner's life than we would, for example, if it had intentionally pilfered all her money.

In addition, I am troubled by the Court's incomplete discussion of the factors justifying a higher ratio between punitive and compensatory damages. It notes the

absence of two factors – the presence of an injury which is hard to detect, or a particularly egregious act resulting in only a small amount of economic damages. Ante at 13. But it fails to discuss the presence of a third, that is, where the monetary value of noneconomic harm is difficult to determine. Such a factor clearly applies to suits involving personal injury and wrongful death. See, e.g., Stafford v. Neurological Med., Inc., 811 F.2d 470, 475 (8th Cir. 1987) (noting deceased's suicide resulting from misdiagnosis was "an injury not easily calculable in economic terms"). I suggest the presence of this one factor alone brings this award within the constitutional limits of due process. See Bielicki v. Terminix Int'l Co., 225 F.3d 1159, 1165 (10th Cir. 2000) (approving a 12:1 ratio between punitive and compensatory damages in a personal injury case); Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1273 (10th Cir. 2000) (approving a 59:1 ratio between punitive and compensatory damages in a personal injury case); Burton v. R.J. Reynolds Tobacco Co., 205 F. Supp. 2d 1253, 1263-65 (D. Kan. 2002) (approving a 75:1 ratio between punitive and compensatory damages in a personal injury suit against tobacco company).

Even if this case did not fall within the specific exception the Supreme Court carved out for cases involving difficult-to-determine noneconomic harm, the mere fact this case involves physical injury rather than economic harm makes it difficult to reconcile our remittitur here with our affirmance in Eden. The Supreme Court listed five factors for the courts to consider when judging the degree of reprehensibility of a defendant's conduct: 1) whether it caused physical rather than economic harm; 2) whether it evinced an indifference to or a reckless disregard of the health or safety of others; 3) whether its target was financially vulnerable; 4) whether it involved repeated actions rather than an isolated incident; and 5) whether its harm resulted from intentional malice, trickery or deceit, rather than mere accident. State Farm, 538 U.S. at 419 (citing Gore, 517 U.S. at 576-77).

In affirming the 4.5:1 ratio in Eden, we discussed the presence of just one of those five factors – intentional malice. See Eden, 370 F.3d at 829. Yet despite the presence of several of the five factors in this case – physical harm, callous disregard to the health and safety of others, repeated incidents of wrongful conduct spanning decades, and calculated deceit – we remit. In sum, I find no principled basis for concluding this award is excessive when compared with our affirmance of the punitive damage award in Eden.

II

Despite my reluctance to agree with the Court's application of State Farm and Gore, and its distinction of Eden, I find myself agreeing with the result it reached for another reason. Ironically, I reach the same result because of a second disagreement I have with the majority's analysis, that is, its rejection of B&W's argument on instructional error.

In State Farm, the Supreme Court said: "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant [because punishment] on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains." 538 U.S. at 410. Pursuant to State Farm, B&W asked the district court to instruct the jury it could "only award punitive damage based upon conduct . . . which had some connection to the harm claimed by the plaintiff."

The district court refused to give that portion of B&W's requested instruction, instead using the Arkansas Model Instruction on punitive damages. B&W argued the district court violated its due process rights when it failed to limit the punitive damage instruction per State Farm because the evidence at trial referred to conduct other than what was directed at Mrs. Boerner. For example, Boerner 1) emphasized

the harm smoking causes nationwide, specifically referring to 450,000 deaths annually, 2) indicated cigarettes are the number one preventable killer in the United States, and 3) introduced the Surgeon General's Reports which described other patients' cancer diagnoses and tobacco-related diseases.

I believe B&W has a valid point. This case is quite similar to State Farm, which also involved evidence of the harm State Farm's wrongful conduct caused on a nationwide basis. To be sure, such evidence is relevant to prove the reprehensibility of a defendant's conduct, and in this case Mr. Boerner undoubtedly offered the evidence to prove just that about American Tobacco's conduct, as well as to establish the causal relationship between cigarettes and Mrs. Boerner's cancer. But State Farm clearly indicates such evidence can not be considered when determining the amount of punitive damages for the specific harm suffered by a plaintiff. I do not believe the punitive damages instruction given by the district court sufficiently limited the jury's consideration to the damages suffered by Mrs. Boerner.

III

I acknowledge a remittitur normally should not be used to cure an instructional error. See Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027-28 (2d Cir. 1991) ("Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award [and] is not designed to compensate for excessive verdicts in cases where [instructional] error has infected the jury's entire consideration of the evidence on damages.") (internal citation and quotations omitted). The proper remedy for instructional error is a new trial on damages. See Jacoby v. Johnson, 120 F. 487, 488 (3d Cir. 1903).

As a result, I would normally be reluctant to agree with the Court's remittitur (based on excessiveness) as a means to reduce the award for amounts not specifically

attributable to the harm suffered by Mrs. Boerner (based on instructional error).  In this case, however, the instructional error would have only affected the *amount* of punitive damages awarded.  So, if a remittitur was ever appropriate to cure an instructional error, this would be the case.

Moreover, a defendant can consent to a remittitur in lieu of a new trial to cure an instructional error.  See id. ("The defendant is entitled to have the damages assessed by a jury under proper instructions by the court.  Of this right the defendant cannot be deprived *without his own consent*.") (emphasis added).  At oral argument, B&W's counsel agreed, when asked, that the court could grant a remittitur to cure the instructional error discussed above.  Based on B&W's acquiescence, therefore, I believe a remittitur is appropriate in this case, and agree with the amount of remittitur ordered by the Court.

IV

Because of the reasons discussed, I concur in the result.

_____